**APPEAL NUMBER: 22-10057**
**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**TERESA PHILLIPS,**

      **Plaintiff-Appellant,**

**v.**

**LEGACY CABINET,**

      **Defendant-Appellee.**

---

**ON APPEAL FROM THE UNITED STATES**
**DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA**

---

**BRIEF FOR PLAINTIFF-APPELLANT**

**Jon C. Goldfarb**
**L. William Smith**
Wiggins, Childs, Pantazis, Fisher,
& Goldfarb, LLC
The Kress Building
301 North 19th Street
Birmingham, Alabama 35203
(205) 314-0500
**Attorneys for Plaintiff-Appellant**

## Certificate of Interested Persons

The Plaintiff-Appellant, Teresa Phillips, hereby submits this Certificate of Interested Persons.

1.    Carmen-Burks, Lieselotte, Attorney for Plaintiff-Appellant;

2.    Goldfarb, Jon C., Attorney for Plaintiff-Appellant;

3.    Hand Arendall Harrison Sale LLC., Counsel for Defendant-Appellee;

4.    Hart, Christine Harding, Attorney for Defendant-Appellee;

5.    Malmat, Christina M., Attorney for Plaintiff-Appellant;

6.    Phillips, Teresa, Plaintiff-Appellant;

7.    Smith, L. William, Attorney for Plaintiff-Appellant;

8.    Waggoner, Mark T., Attorney for Defendant-Appellee;

9.    Wiggins, Childs, Pantazis, Fisher, & Goldfarb, LLC., Counsel for Plaintiff-Appellant.

## <u>Statement Regarding Oral Argument</u>

Oral argument is requested and necessary. All of the issues in this appeal require oral argument because: (l) the appeal is not frivolous; (2) the facts and legal arguments cannot be adequately presented in the briefs and record; and (3) the decisional process will be significantly aided by oral argument.

## <u>Certificate of Type Size and Style</u>

Pursuant to Eleventh Circuit Rule 28.1 (d) the following is the type size and styled used in this brief: Times New Roman 14 pt.

# **Table of Contents**

**Pages:**

Certificate of Interested Persons……………………………………...……………….2

Statement Regarding Oral Argument………………………………………………3

Certificate of Type Size and Style………………………………………………4

Table of Contents…………………………………………………………...5

Table of Authorities…………………………………………………………...8

Table of Record References in the Brief………………………………………11

Statement of Subject-Matter and Appellate Jurisdiction…………………………14

Statement of the Issues………………………………………………………15

Course of Proceedings Below……………………………………………..16

The Trial Court's Summary Judgment Disposition………………………………17

Plaintiff's Statement of Facts………………………………………………...23

     A.    Background, Plaintiff's Employment, and Chain of Command…….23

     B.    Plaintiff's Supervisor Derrick O'Neal Institutes a Last Minute
          Schedule Change Requiring Employees to Work all Weekend……..24

     C.    African American Employees on Plaintiff's Shift, Including Derrick
          Stockdale and Tavia Craig, Were Loud, Interrupting, and Cursing
          O'Neal During the October 12, 2019 Meeting……………………...24

     D.    Plaintiff Speaks Up Only When O'Neal Directs Her To, Does Not
          Interrupt Him, and Is Not Disrespectful…………………………….25

     E.    O'Neal Immediately Suspends Plaintiff but Won't Tell Her Why….27

F.      O'Neal Terminates Plaintiff after Falsely Claiming that She Was Irate And That She Called Him "Stupid" Three Times; But She Was Not Irate and Did Not Call Him Stupid Before He Fired Her…………..28

G.      Plaintiff Was Fired Before the Disputed Events Regarding the Parking Tag At Her Car………………………………………………………32

H.      Plaintiff Was Replaced by an African-American Employee………..33

I.       During the Same Meeting Where Plaintiff Spoke Up, Derrick Stockdale and Tavia Craig Engaged in Similar or More Egregious Conduct and Were Treated More Favorably………………………...33

J.       The Record Reflects that Numerous African American Employees Were Insubordinate and Cursed Supervisors and Received Lesser Discipline Short of Termination……………………………………34

Scope of Review………………………………………………………………..37

Summary of Argument…………………………………………………………38

Argument and Citations of Authority…………………………………………..40

A.      The Trial Court Correctly Determined that Plaintiff Established a Prima Facie Case of Discrimination Under Either a "Replacement" or a "Comparator" Formulation………………………………………..40

B.      The Trial Court Erred in Concluding that Plaintiff Had Established Only "Pretext of Something," and in Disregarding Plaintiff's Comparator Evidence at the Pretext Stage…………………………..40

      (1)    The Trial Court Erred in Concluding that Plaintiff Established Only "Pretext of Something."………………………………...41

      (2)    The Trial Court Erred in Disregarding Plaintiff's Comparator Evidence at the Pretext Stage of the *McDonnell Douglas* Framework……………………………………………………47

(3)     The Trial Court Further Erred in Failing to Recognize that Plaintiff's Comparator Evidence *Is* Evidence of Race Discrimination……………………………………………..50

(4)     The Trial Court Erred in Relying on O'Neal's Failure to Terminate Other White Employees in Different Situations as Precluding an Inference of Race Discrimination Here……….52

C.     The Trial Court Erred in Granting Summary Judgment on Plaintiff's "Mixed Motive" Theory of Relief………………………………..54

Conclusion……………………………………………………………………...58

Certificate of Compliance…………………………………………………59

Certificate of Service……………………………………………………60

# Table of Authorities

**Pages:**

28 U.S.C. 1291, 1331, 1343, 1391, 2201, 2202……………………………………14

42 USC §1981…………………………………………………………...20, 48

42 U.S.C. § 2000e—2(m)…………………………………………………56

42 U.S.C. 12117…………………………………………………………..14

42 U.S.C. 12133…………………………………………………………..14

Fed. R. App. P. (32)(a)(7)(B)…………………………………………..59

Title VII……………………………………………………….20, 48, 55-57

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 250, 251 (1986)…………………………………..43

*Burnette v. Taylor*,
    533 F.3d 1325, 1330 (11th Cir. 2008)………………………………...40

*Combs v. Plantation Patterns, Meadowcraft, Inc.*,
    106 F.3d 1519, 1538 (11th Cir. 1997)……………………………...43-44, 46

*Connecticut v. Teal*,
    457 U.S. 440, 455 (1982)…………………………………………..53

*Hawkins v. Ceco Corp.*,
    883 F.2d 977, 984 (11th Cir. 1989)………………………………...40

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167, 174, (2005)…………………………………………….50

*Kragor v. Takeda Pharm. Am., Inc.*,
    702 F.3d 1304, 1311 (11th Cir. 2012)………………………………...43

*Lewis v. City of Union City*,
　　918 F.3d 1213 (11th Cir. 2019)…………………………………………….51

*Lozano v. Ocwen Fed. Bank, FSB*,
　　489 F.3d 636, 641 (5th Cir. 2007)………………………………………….55

*McDonnell Douglas Corp. v. Green*,
　　411 U.S. 792, 804 (U.S. 1973)…………………………17-18, 46-47, 52, 56

*Olmstead v. L. C.*,
　　527 U.S. 581, 614 (1999)………………………………………………..50

*Quigg v. Thomas Cnty. Sch. Dist.*,
　　43814 F.3d 1227, 1235, 1237-1239 (11th Cir. 2016)…………………..56-57

*Rawls v. State Dep't of Human Res.*,
　　507 F. App'x 895, 898 (11th Cir. 2013)…………………………………54

*Reeves v. Sanderson Plumbing Prods.*,
　　530 U.S. 133, 147-150 (2000)……………………………..38-39, 41-44

*Rioux v. City of Atlanta*,
　　520 F.3d 1269, 1276 (11th Cir. 2008)……………………………………51

*Ross v. Rhodes Furniture*,
　　146 F.3d 1286, 1291 (11th Cir. 1998)……………………………………49

*Smith v. Lockheed-Martin Corp.*,
　　644 F.3d 1321, 1343 (11th Cir. 2011)……………………………………57

*Stardust, 3007 LLC v. City of Brookhaven*,
　　899 F.3d 1164, 1170 (11th Cir. 2018)……………………………………37

*Texas Dep't of Cmty. Affairs v. Burdine*,
　　450 U.S. 248, 251-53, 101 S. Ct. 1089, 1092-93, 67 L. Ed. 2d 207 (1981)
　　……………………………………………………………………...56

*Walker v. St. Joseph's/Candler Health Sys.*,
    506 Fed. Appx. 886, 889 (11th Cir. 2013)…………………………………..51

*Wilson v. B/E Aero., Inc.,*
    376 F.3d 1079, 1088 (11th Cir. 2004)…………………………………...39, 47

**Table of Record References in the Brief**

| Brief Page No. | Filing | Docket No. |
|---|---|---|
|  | Table of Record References in the Brief |  |
|  | Docket Sheet |  |
| 16 | Complaint, filed October 5th, 2020 | 1 |
| 16 | Answer, filed November 2nd, 2020 | 4 |
| 16, 54 | Defendant's Motion for Summary Judgment, filed June 7th, 2021 | 14 |
| 17, 23-25, 27-28, 30-33, 35, 45-46 | Defendant's Evidentiary Submission, Exhibit 1, Deposition of Plaintiff Teresa Phillips and Exhibits | 15-1 |
| 23-25, 27, 29-35, 44-45 | Defendant's Evidentiary Submission, Exhibit 2, Deposition of Derrick O'Neal and Exhibit | 15-2 |
| 26-28, 31, 33, 45 | Defendant's Evidentiary Submission, Exhibit 3, Deposition of Shane Hanna and Exhibit | 15-3 |
| 31-32, 34, 45 | Defendant's Evidentiary Submission, Exhibit 4, Deposition of Plaintiff Troy Melton and Exhibit | 15-4 |
| 19, 21, 31, 52 | Defendant's Evidentiary Submission, Exhibit 5, Legacy Disciplinary Records & Demographic Information | 15-5 |
| 16, 54-55 | Brief in Support of Defendant's Motion for Summary Judgment, filed June 8th, 2021 | 16 |
| 20, 48, 51 | Plaintiff's Evidentiary Submission, Exhibit 1, Legacy 0242-0243 | 17-1 |

| 27, 29-30, 32 | Plaintiff's Evidentiary Submission, Exhibit 2, Declaration of Theresa Phillips | 17-2 |
|---|---|---|
| 33-35 | Plaintiff's Evidentiary Submission, Exhibit 3, Legacy 1263-1268 | 17-3 |
| 34-36 | Plaintiff's Evidentiary Submission, Exhibit 4, Legacy 0700, 0726, 0794-5, 0810, 0823, 1029, 1047, 1083, 1088, 1108, 1122, 1143 | 17-4 |
| 16, 20-21, 48-49 | Plaintiff's Opposition to Defendant's Motion for Summary Judgment, filed June 18th, 2021 | 18 |
| 16, 54 | Defendant's Reply in Support of Motion for Summary Judgment, filed July 2nd, 2021 | 19 |
| 16, 55 | Text Order Requesting Defendant to file Supplemental Brief, filed October 18th, 2021 | 21 |
| 16 | Defendant's Supplemental Brief in Support of Motion for Summary Judgment, filed November 5th, 2021 | 22 |
| 16 | Plaintiff's Motion for Leave to File Response to Defendant's Supplemental Summary Judgment Brief, filed November 8th, 2021 | 23 |
| 16 | Text Order Granting Plaintiff's Motion for Leave to File Response to Defendant's Supplemental Brief, filed November 9th, 2021 | 24 |
| 16 | Plaintiff's Response to Defendant's Supplemental Summary Judgment Brief, filed November 9th, 2021 | 25 |
| 16 | Defendant's Motion for Leave to File Response to Plaintiff's Supplemental Brief, filed November 10th, 2021 | 26 |

| 16 | Text Order Granting Defendant's Motion for Leave to File Response to Plaintiff's Supplemental Brief, filed November 12th, 2021 | 27 |
|---|---|---|
| 16 | Defendant's Reply to Plaintiff's Supplemental Brief, filed November 15th, 2021 | 28 |
| 14, 16-22, 38, 40, 46-47, 49-55 | Memorandum Opinion | 29 |
| 14, 16 | Final Order | 30 |
| 16 | Notice of Appeal | 31 |

## Statement of Subject-Matter and Appellate Jurisdiction

The district Court's jurisdiction is in accordance with 28 U.S.C. 1331, 1343, 2201, 2202, 42 U.S.C. 12117, and 42 U.S.C. 12133, as Plaintiff's claims arise under federal law. Venue is proper pursuant to 28 U.S.C. 1391. On December 29, 2021, the district court issued its order granting defendant's motion for summary judgment and entered judgment against Plaintiff. (Docs. 29, 30). Plaintiff timely fled her notice of appeal on January 7, 2022. (Doc. 31). This Court has jurisdiction under 28 U.S.C. § 1291.

## **Statement of the Issues**

Whether, in this race discrimination case, the trial court erred in granting summary judgment against Plaintiff, who is white, despite recognizing that Plaintiff had established a prima facie case through comparator evidence and despite finding that "a reasonable juror could find that Phillips was not insubordinate, and that O'Neal and Hanna's testimony that Phillips was disrespectful and insubordinate shows pretext of something"; whether the trial court further erred in failing to consider as further evidence of pretext the two African American comparators who were insubordinate and cursing in the very same meeting where Plaintiff spoke up but received no discipline, along with twelve other African American comparators who were egregiously disrespectful and insubordinate, including cursing at supervisors, but received discipline short of termination; and whether the trial court erred in granting summary judgment on Plaintiff's "mixed motive" theory of relief.

## Course of Proceedings Below

Plaintiff filed her complaint on October 5, 2020, and Defendant timely answered. (Doc. 1, Doc. 4). After discovery, Defendant filed a motion for summary judgment on June 8, 2021. (Doc. 14). Plaintiff filed a response (Doc. 18) and Defendant filed a reply (Doc. 19). Neither Defendant's motion for summary judgment nor its reply addressed Plaintiff's "mixed motive" theory of relief. (Docs. 14, 16, 19). The Court *sua sponte* issued an order directing Defendant "to file a brief applying the specific facts of this case to the mixed-motive theory of race discrimination." (Doc. 21). Defendant filed its supplemental brief on November 5, 2021. (Doc. 22). Because the Court's order contained no provision for the plaintiff to file a responsive submission, Plaintiff filed a motion for leave to submit a response to Defendant's supplemental brief on November 5, 2021. (Doc. 23). The Court granted this motion, and Plaintiff filed her supplemental brief on November 9, 2021. (Docs. 24, 25). Defendant then sought, and the Court granted leave, to file a supplemental reply brief, which Defendant did on November 15, 2021. (Docs. 26, 27, 28). The Court granted summary judgment on all claims in a memorandum opinion dated December 29, 2021, with a final judgment issuing that day. (Docs. 29, 30). Plaintiff timely fled her notice of appeal on January 7, 2022. (Doc. 31).

## <u>The Trial Court's Summary Judgment Disposition</u>

In granting summary judgment, the Court applied the *McDonnell Douglas* burden-shifting framework. (Doc. 29 at 8). The Court first correctly determined that, taking the facts in the light most favorable to the non-moving party, Plaintiff had established a prima facie case of discrimination by identifying numerous similarly situated comparators, including the two African American employees who spoke up in the Saturday meeting and were not disciplined, as well as "minority employees that O'Neal called to his office but did not fire," i.e. employees identified by Plaintiff who received some lesser discipline short of termination. (Doc. 29 at 8). In finding that Plaintiff had established a prima facie case, the Court reasoned as follows:

> the court must accept Phillips' testimony and declaration as true. That means the court must assume that Phillips was not insubordinate during the group meeting; she merely told O'Neal that "it was unfair that we had been working these late hours and long weeks" and "[w]e're all tired." Doc. 15-1 at 84. And the court must assume that O'Neal fired Phillips unprovoked, not because Phillips called O'Neal stupid or questioned his management decisions. Doc. 15-1 at 90, 100-01.

> With those caveats, the court finds that a reasonable juror could find either that Phillips was similarly situated to Stockdale and Tink during the Saturday group meeting or to other minority employees that O'Neal called to his office but did not fire.

(Doc. 29 at 8). The Court also found that "[t]o the extent that it is needed to make a prima facie case, the court finds that Phillips sufficiently established that she was replaced by a non-white employee." (Doc. 29 at 10 fn2).

Turning to the pretext stage of the *McDonnell Douglas* burden-shifting framework, the District Court also correctly recognized a key factual dispute regarding Defendant's articulated reason for terminating Plaintiff's employment:

> the parties dispute what O'Neal and Phillips said in the minutes before O'Neal fired Phillips. Perhaps Legacy is right: Phillips continually interrupted O'Neal as he tried to talk to the line employees, then called him stupid and criticized his management once in his office. Perhaps Phillips is right: O'Neal is a boor who snapped at Phillips for merely saying what everyone was thinking.

(Doc. 29 at 7-8). Based on this factual dispute, the Court found that Plaintiff had established "pretext of something": "a reasonable juror could find that Phillips was not insubordinate, and that O'Neal and Hanna's testimony that Phillips was disrespectful and insubordinate shows pretext of something." (Doc. 29 at 13). However, the Court reasoned that "Phillips has no evidence from her incident that would prove that O'Neal fired her because she was white." (Doc. 29 at 14). In so reasoning, the trial court made no mention of evidence it had already addressed at the prima facie stage of the *McDonnell Douglas* analysis, where the court found, as quoted above, "that Phillips was similarly situated to Stockdale and Tink during the

Saturday group meeting." (Doc. 29 at 8).[1] Without mentioning this evidence, the trial court observed that "Phillips instead points to other disciplinary incidents in which O'Neal failed to fire a black or Hispanic employee." (Doc. 29 at 14).

The trial court then reasoned that because O'Neal had disciplined both black and white employees on other occasions, Plaintiff could not show that O'Neal fired her because she is white on this occasion:

> … the disciplinary records (docs. 15-5, 17-4), when viewed as a whole, tend to disprove Phillips' claim of racial bias. The records show that O'Neal took disciplinary action against 31 individuals; 17 were black, 11 were white, two were Hispanic, and one was not identified by race. Doc. 15-5. Those records show that O'Neal disciplined white employees for similar behavior, without firing them…

(Doc. 29 at 14).

Despite having earlier concluded that Plaintiff was similarly situated to two African American employees, Stockdale and Craig ("Tink"), who also spoke up in the Saturday meeting but were not fired, see Doc. 29 at 8 (finding that "that a reasonable juror could find either that Phillips was similarly situated to Stockdale and Tink during the Saturday group meeting"), the Court at the pretext stage did not address Stockdale and Craig among Plaintiff's comparators, even though Plaintiff had argued that O'Neal's more favorable treatment of Stockdale and Craig

---

[1] "Tink" is the nickname of Tavia Craig, one of Plaintiff's African-American coworkers.

established a prima facie case as well as pretext. (Doc. 29 at 13-16).[2] Instead, the

Court focused on two white individuals, Kelly Pate and Chris Tarwater, whose

-------------------

[2] Plaintiff argued on pages 23-24 of Plaintiff's brief that she had identified "at least fourteen African American comparators who were treated more favorably by O'Neal and by Defendant" and that "[t]wo of these comparators, Craig and Stockdale, were insubordinate in the very meeting that preceded Plaintiff's termination." (Doc. 18 at 23). Plaintiff argued on pages 25-26 of her brief as follows:

> Plaintiff denies engaging in misconduct such as repeatedly interrupting O'Neal, being disrespectful in the meeting, saying this place is "going to hell," or repeatedly calling O'Neal stupid before she was terminated; accordingly, a reasonable jury could find that O'Neal fired her simply for speaking up in the meeting. But Craig and Stockdale also spoke up in the meeting, and they did so in a far more disrespectful manner than Plaintiff did. They were loud and "cussing," using words such as "hell and damn and the 'f' word." (Doc. 17-1, 82:19-83:7). However, neither of these African American employees was fired. Moreover, even if the Court were to accept O'Neal's framing of Plaintiff's alleged misconduct – that he terminated Plaintiff "[f]or being insubordinate and disrespectful out on the floor and resulting to name calling" – a reasonable jury could still find that Craig's and Stockdale's conduct in the meeting, including being loud and "cussing," constituted "the same basic conduct" that O'Neal cites as the basis for Plaintiff's termination.

(Doc. 18 at 25-26). Plaintiff further argued in the pretext section of her brief that "the jury may further infer both pretext and the 'ultimate fact of intentional discrimination' in violation of Title VII and 42 USC §1981 from the comparator evidence discussed above" (Doc. 18 at 30) and further argued that "showing that Plaintiff's race was the determining or "but for" factor in O'Neal's differential treatment of her and her African-American co-workers, O'Neal terminated her for speaking up while allowing Craig, Stockdale, and at least twelve other African American employees who engaged in serious insubordination, including cursing at

disciplinary records were contained in Defendant's evidentiary filing. (Doc. 29 at 14) (citing Doc. 15-5 at 15, 5). The Court reasoned that these disciplinary records showed that O'Neal had "disciplined white employees for similar behavior, without firing them." (Doc. 29 at 14). In the Court's view, O'Neal's failure to terminate Pate and Tarwater under different factual circumstances meant he could not have discriminated against Plaintiff: "[a]t best, Phillips' reliance on her version of events plus O'Neal's history of disciplining other employees could prove that O'Neal was a boorish boss. But that evidence shows he was equally boorish." (Doc. 29 at 14, 17). In concluding that O'Neal was "equally boorish," the Court overlooked that Plaintiff had identified, in addition to Stockdale and Craig, at least twelve African American comparators whom O'Neal had treated more favorably. (See Doc. 18 at 20-21).

The Court concluded that a reasonable juror could "find that O'Neal's talk of insubordination was pretext of something; it would not allow a juror to decide that it was pretext of racial discrimination." (Doc. 29 at 15). Without having examined as evidence of pretext O'Neal's more favorable treatment of two African American employees in the same meeting where Plaintiff also spoke up, the Court concluded "[a]t best, Phillips might prove to a reasonable juror that O'Neal fired her for a 'bad

---

supervisors, either to escape discipline or remain employed with lesser discipline short of termination." (Doc. 18 at 31).

reason' or 'a reason based on erroneous facts.' But she presents no evidence that O'Neal fired her because she was white." (Doc. 29 at 16).

Based on the same reasoning, the Court also granted summary judgment on Plaintiff's mixed motive theory of relief, reasoning that "Phillips fails to present evidence that would allow a reasonable juror to find that race played a role in O'Neal's decision to fire Phillips. While there may be more than one factor that lead to O'Neal's decision, there is no evidence that race was one of them." (Doc. 29 at 17).

## Plaintiff's Statement of Facts.

### A. Background, Plaintiff's Employment, and Chain of Command.

Plaintiff, who is white, began working at Defendant's facility through a staffing company in 2012 as an assembly worker. (Doc. 15-1, 36:2-37:12). She became a direct employee of Defendant on January 13, 2014 as an inspector in paint room 3, the position she held for most of her employment; at the time of her termination her duties involved paint inspecting and repair. (Doc. 15-1, 38:20-22; 40:2-41:8).

Derrick O'Neal, who is African American, became an operations manager at Legacy in July 2019. (Doc. 15-2, 7:15-8:4; 50:9-52:10). O'Neal reported to plant manager Craig Watts. (Doc. 15-2, 30:13-15). At the time of Plaintiff's termination, O'Neal was over Paint Room 3 where Plaintiff worked. (Doc. 15-2, 53:14-23). Associates in Paint Room 3 generally worked a twelve-hour shift, four days per week, twelve hours per day. (Doc. 15-2, 54:22-55:22; Doc. 15-1, 54:1-16). However, after O'Neal become Operations Manager, he had them working longer hours and longer shifts: "We would work 12 to 14 hours Monday through Sunday." (Doc. 15-1, 54:14-55:3).

Reporting to O'Neal in Paint Room 3 was the assistant supervisor Shane Hanna, who at that time was an hourly employee. (Doc. 15-2, 54:5-10; 63:7-19). As

Operations Manager, O'Neal had authority to hire and fire. (Doc. 15-2, 34:7-23). O'Neal also had the authority to discipline employees. (Doc. 15-2, 35:12-36:21).

**B. Plaintiff's Supervisor Derrick O'Neal Institutes a Last Minute Schedule Change Requiring Employees to Work All Weekend.**

O'Neal terminated Plaintiff's employment on Saturday, October 12, 2019. (Doc. 15-1, 57:18-21). That day coincided with "race weekend" at Talladega Speedway, located across the boulevard from Defendant's facility. (Doc. 15-1, 57:22-58:1). The schedule that weekend originally had Plaintiff and her coworkers working 4 hours Saturday and off Sunday; however, on Friday evening O'Neal changed the plan to work twelve hours Saturday and also to work Sunday. (Doc. 15-1, 75:10-76:3; 80:10-82:7). O'Neal made this change at the direction of plant manager Craig Watts. (Doc. 15-2, 71:1-72:5).

Several of Plaintiff's coworkers were late that Saturday, and others didn't show up at all. (Doc. 15-1, 70:5-21; Doc. 15-2, 70:2-71:10). Derrick Stockdale came in two hours late, but O'Neal "just made a joke out of it," and was "laughing and joking and cutting up with him for not coming in." (Doc. 15-1, 88:12-18; 72:1-5).

**C. African-American Employees on Plaintiff's Shift, Including Derrick Stockdale and Tavia Craig, Were Loud, Interrupting, and Cursing O'Neal During the October 12, 2019 Meeting.**

At the end of the shift on October 12, 2019, O'Neal called a meeting to discuss the schedule and "was telling everybody that we were going to work Sundays," i.e. the next day, "[a]nd Derrick Stockdale and Tink and a few others started fussing,"

24

according to Plaintiff. (Doc. 15-1, 73:15-23). "And Derrick Stockdale was raising his voice because he wanted to spend time – he had a three-year-old or two-year-old, and he wasn't getting to see his little boy. And Tink was arguing with him. And they were loud...." (Doc. 15-1, 73:15-23; 74:11-15; 75:4-9).

"Tink", whose real name is Tavia Craig, raised his voice in the meeting to O'Neal. (Doc. 15-1, 77:21-78:2). Stockdale and Craig were loud and "cussing," using words such as "hell and damn and the 'f' word." (Doc. 15-1, 82:19-83:7). Craig also said he wasn't coming in on Sunday; O'Neal isn't sure if he came in or not. (Doc. 15-2, 90:1-10). Craig is African American. (Doc. 15-2, 90:10-12).

## D. **Plaintiff Speaks Up Only When O'Neal Directs Her To, Does Not Interrupt Him, and Is Not Disrespectful.**

Plaintiff was shaking her head but not verbally objecting as were her African American co-workers on the shift; however, O'Neal singled her out, asking her, "Have you got something you want to say?" (Doc. 15-1, 74:1-4).  In response, Plaintiff told him it was "unfair that we had been working these late hours and long weeks," and "We're all tired." (Doc. 15-1, 74:5-7, 84:6-19). Shane Hanna confirmed that Plaintiff, Tink, and Stockdale spoke up in the meeting. (Doc. 15-2, 28:10-29:8). O'Neal testified that "Teresa and a couple more guys … kept interrupting while I was trying to get the message across to everyone." (Doc. 15-2, 72:15-18).

O'Neal immediately "started blowing up" after Plaintiff spoke. (Doc. 15-1, 84:20-23). Shane Hanna's statement confirms that after Plaintiff spoke, O'Neal "told

her that Alabama was a right to work state and he could set whatever hours he wanted

to, to get the job done. And he said he could fire her on the spot." (Doc. 15-3, pp.

39-40; Doc. 15-3, 74:6-15).[3] However, in contrast with Plaintiff's testimony that she

did not speak until O'Neal asked her if she had something to say, O'Neal testified,

"[e]veryone except for Teresa kind of backed off and let me finish talking" and that

"[s]he kept interrupting saying it's against the law, that you can't schedule us to

---

[3] Assistant supervisor Shane Hanna's written statement (hearsay if sought to be introduced by Defendant for the truth of its contents) reads:

On Saturday 10-12-18 we had a meeting at the end of the shift. Derrick told everyone that we were shutting down at 5:30 pm but we had to work Sunday the 13th. There was a lot of disappointment among the employees. Teresa Philips spoke up and said that he couldn't make that mandatory because we had already put in our hours. He told her that Alabama was a right to work state and he could set whatever hours he wanted to, to get the job done. And he said he could fire her on the spot and she said that was fine. He told her to come with him after the meeting and she told him she was ready. We walked to his office during which time she told him that he didn't know how to talk to people or how to treat people. And he said he wasn't a bad guy when he gave her a gift card the day before for doing a good job. We brought her into Derrick's office and he told her she was suspended indefinitely and that HR would get in touch with her when and if she could come back. She said that was fine and she didn't know if she wanted to come back. He told her that was all and we started walking out. During that time he looked back to me saying I wasn't a bad guy when I gave her that gift card was I and she stopped and told him he could have it back. We were headed back towards the paint room and I was stopped by another employee, that I thanked for their time, and asked to work the next day. Derrick and Teresa continued walking so I don't know what transpired after that. Derrick came back and told me she became hostile and he had to terminate her.

(Doc. 15-3, pp. 39-40; Doc. 15-3, 41:16-19).

work on Sunday," and that "[s]he just kept on, kept on." (Doc. 15-2, 73:1-10). O'Neal testified, "So I told Teresa, I said, 'Come a little closer so me and you can have a conversation,' and that's when she went to telling me that she's not coming." (Doc. 15-2, 73:15-75:1). Plaintiff, for her part, disputes that she said she wasn't coming Sunday: "I stayed there and worked all day that day. I would have came in that Sunday or the rest of the time I had to work. I didn't have no trouble or problem working the job." (Doc. 15-1, 89:17-21).

### E. **O'Neal Immediately Suspends Plaintiff but Won't Tell Her Why.**

O'Neal then sent Plaintiff's coworkers home but told Plaintiff to come to the office. (Doc. 15-1, 85:4-86:3). In the office, with Shane Hanna present, O'Neal told Plaintiff that she was suspended and that on Monday HR would decide what to do with her; O'Neal's response when Plaintiff asked why she was suspended was, "We're through here." (Doc. 15-1, 90:3-18, 91:5-9; 91:10-13). O'Neal claims that he decided to send Plaintiff home at four PM and suspend her for the rest of the weekend after she told him, "this place is going to crap or shit or something … because of me and I didn't know what I was doing and this place is not going to last long." (Doc. 15-1, 75:22-76:21). Shane Hanna, who was present, did not recall Plaintiff saying this. (Doc. 15-3, 41:16-19; 47:8-48:11; Doc. 15-3 pp. 39-40). The reason Hanna does not recall this is that Plaintiff did not say it. (Doc. 17-2 ¶ 5).

In contrast with O'Neal's testimony, Hanna testified that Plaintiff was not hostile but rather "disappointed and upset," and that in fact "everybody was upset about having to come in and not having a day off in a while." (Doc. 15-3, 41:20-42:11). As they were walking out, O'Neal made a comment to Shane Hanna about thinking Plaintiff was a good worker and having given her a gift card the week before; Plaintiff told him "I am a good worker" and that the gift card was in her car if he wanted it back. (Doc. 15-1, 100:1-12).

**F. O'Neal Terminates Plaintiff after Falsely Claiming that She Was Irate And That She Called Him "Stupid" Three Times; But She Was Not Irate and Did Not Call Him Stupid Before He Fired Her.**

After Plaintiff, O'Neal, and Hanna left the office, Hanna then walked off in a different direction; Plaintiff testified that O'Neal then "turned around real quick and got in my face, it scared me." (Doc. 15-1, 90:19-91:4; 103:14-20). O'Neal told Plaintiff that she was fired (rather than just suspended) and "not to sign up for unemployment and don't try to get another job at a cabinet place because he would make sure I didn't get it." (Doc. 15-1, 90:11-18; 100:21-101:411).

O'Neal then called someone on his two-way radio and falsely told that person that Plaintiff was being "irate" and that he needed "backup." (Doc. 15-1, 90:19-91:4; 92:13-14).). However, Plaintiff "wasn't doing anything but standing there." (Doc. 15-1, 95:6-10). She was not being "irate." (Doc. 15-1, 103:3-13).

O'Neal provided the following disputed account of Plaintiff's termination:

I said, 'HR will call you Monday, and you come on up and talk to HR.'
So she said, 'So you're firing me?' I said, 'No, ma'am, I'm not firing
you.' I said, 'Right now, you're disgruntled,' I said, 'You're being very
disrespectful to me,' I said, 'So I'm going to let you go home, you know,
and you think about it and come back in on Monday morning,' giving
her the Sunday that she was complaining about off because I didn't want
that attitude to drag out on the floor. So I'm giving her an out. So she
said, 'Okay.' So we were walking back out. She keep -- anyone passes
her she'll stop and 'This place is going to hell, he's trying to fire me.' I
said, 'Teresa, I'm not firing you.' I said, 'I'm telling you again, I'm not
firing you, you are not fired,' I said, 'But I can't let you display this type
of attitude out on the floor especially on a Saturday when people don't
want to be here and you getting people riled up, so I'm sending you
home.' Shane was walking with me. Another associate walked up, and
Shane got pulled off talking to that associate. So I stopped, and I asked
her to stop. She kept trying to walk. I said, 'Could you please stop,' and
I told Troy, I said, 'Troy, come on and walk with me so we can take
Ms. Teresa out to her car.' We got right there where the time clock was
at. I said, 'Go ahead and clock out.' And she called me stupid on several
occasions. I said, 'Teresa, you call me stupid again, I'm going to be
forced to terminate you because now you're really crossing the line.'
And she said, 'You are stupid, and this place is going to shit.' I said,
'So now you just fired yourself because I asked you not to do that
especially out here on the floor in front of people.' I told her to get out
of the plant…

(Doc. 15-2, 76:11-79:22; Doc. 17-2 ¶ 7).[4]

---

[4] O'Neal also gave a written statement (hearsay if sought to be introduced by
Defendant for the truth of its contents): "On 10/12/19 the entire plant was working
on that Saturday. During the managers meeting we decided that it would be in the
best interest of the company to work on 10/13/19 which was a Sunday. As I
attempted to notify paint room #3 that we would be working on Sunday, Teresa
Phillip continued to interrupt my huddle saying I couldn't schedule Sunday as a
work day and that she wasn't coming. I then informed her that Sunday will be a
scheduled work day and she could talk to me after the meeting. Teresa continued to
be disruptive during my huddle meeting. After the meeting I informed her that we
could have a one on one conversation. During that conversation Teresa continued
to be disruptive. At that point I ask Shane Hanna to come with Teresa and I to my

O'Neal gave testimony (disputed by Plaintiff) that they were standing at the time clock when he fired Plaintiff. (Doc. 15-2, 80:8-81:7; Doc. 17-2 ¶ 7). "She called me stupid three times. After the second time, I said, 'If you continue, I'll be forced to terminate you,' and she did it again." (Doc. 15-2, 88:2-10; Doc. 17-2 ¶7). O'Neal testified that he terminated Plaintiff "[f]or being insubordinate and disrespectful out on the floor and resulting to name calling." (Doc. 15-2, 106:2-10).

In contrast with the above account, Plaintiff only said, "That's stupid" after O'Neal had already told her that she was fired and after he made the false report that she was being "irate." (Doc. 15-1, 92:10-16, 101:15-102:4; Doc. 17-2 ¶ 7). Plaintiff testified, "I wasn't doing anything. I was just standing there. And when he got on

---

office. During the walk to my office Teresa continued to be disruptive about working on Sunday. Once in my office I informed Teresa that paint 3 will work Sunday. Teresa continued to attempt to argue with me about the law and that she didn't have to work. I explained to her that was her choice. I then informed Teresa that she could leave and return on Monday when HR reached out to her. She stated so you firing me. I said no HR will notify you on Monday. As Shane and I walked her back to paint 3, Teresa continued to be disruptive. During the walk back Shane got pulled off by another associate. I then ask troy Melton to continue the walk with us. I then Radio Craig Watts to update him on the situation. Teresa when called me "Stupid" and that I didn't know what I was doing and that this place is going to shits because of people like me. I informed Teresa at that moment, she was now terminated and needed to leave. Teresa stop several times to communicate with other associates, telling them I fired her for no reason. I again asked Teresa to come with troy and I out of the plant or I would be forced to call the police. She again continued to tell me I couldn't fire her and she would be back. Finally as she excited the plant with Troy and I, Teresa threw her parking pass at me, hitting me in the chest." (Doc. 15-2, pp. 57-62).

there and said I was being irate, then I said that was stupid to call and say something that I wasn't doing." (Doc. 15-1, 93:9-17; 95:4-96:5; Doc. 15-1, 102:3-10).

Face Frame Supervisor Troy Melton was present at this time, and according to O'Neal's testimony he should have heard his exchange of words with Plaintiff. (Doc. 15-2, 96:11-97:23; Doc. 15-4, 14:19-20). O'Neal told Hanna that he "had to get Troy [Melton] to help him escort her out because she got hostile." (Doc. 15-3, 44:10-15). However, when Hanna asked Melton what happened, Melton's response was "I don't really know, man, I got there at the end." (Doc. 15-3, 44:10-17).

Melton's written statement contains nothing about Plaintiff calling O'Neal "stupid," and neither Hanna nor Melton witnessed any confrontation inside the plant; nor did either of them witness any bad behavior from Plaintiff between the time of the meeting where she and others spoke up and the termination of her employment. (Doc. 15-4, p. 32; Doc. 15-5, 42:2-21; 54:22-55:2; Doc. 15-3, 46:23-47:23).[5]

O'Neal gave testimony, disputed by Plaintiff, that after he fired Plaintiff, he and Melton walked her through the plant to retrieve her belongings and Plaintiff "kept dragging… She wants to engage in conversation with anyone who is willing to hear her saying how she's being mistreated and she's being fired." (Doc. 15-2,

---

[5] Melton's written statement reads: "I witnessed Derrick walking an employee thru paint room 3. Derrick asked me to accompany him as he walked. I walked beside Derrick and the employee was walking a couple of steps in front of us. When we got to the employee's automobile, she sat down in her car and broke her parking decal off of her rear-view mirror and threw it at Derrick." (Doc. 15-3, pp.39-40).

78:6-14; Doc. 17-2 ¶ 6). Again, Plaintiff disputes this, testifying, "I was just walking and trying to recollect what was going on…thinking about everything that had just happened and trying to figure out why it happened." (Doc. 15-1, 103:6-13). Plaintiff may have given a few hugs as she left but was not disruptive. (Doc. 15-1, Dec. ¶ 6).

G. **Plaintiff Was Fired Before the Disputed Events Regarding the Parking Tag At Her Car.**

Troy Melton and O'Neal then walked Plaintiff to her car. (Doc. 15-1, 104:19-21). When asked, "Anyway, by the time you got to the parking lot, she was fired anyway, right?" O'Neal answered, "Yes." (Doc. 15-2, 116:14-16). In the parking lot, Plaintiff did not intentionally throw her parking decal at O'Neal and hit him in the chest; rather, it was so old that when she removed it from her vehicle it crumbled and fell into pieces as she tried to hand it to him over the window of her car. (Doc. 15-2, 79:9-12; Doc. 15-1, 105:2-106:1). Melton confirmed that the parking tag broke as Plaintiff tried to give it to O'Neil. (Doc. 15-4, 44:4-18).

O'Neal testified that he spoke to HR Manager Hernandez on Monday and told her that he wanted Plaintiff terminated "due to the fact that she was being so disrespectful out on that floor and resorted to name calling to the operations manager, which is something that you just don't do out on the floor." (Doc. 15-2, 79:13-21). Hernandez asked O'Neal to provide a statement. (Doc. 15-2, 79:23-80:7).

**H. Plaintiff Was Replaced by an African-American Employee.**

Defendant replaced Plaintiff with an African-American employee. (Doc. 15-3, 19:23-20:6).

**I. During the Same Meeting where Plaintiff Spoke Up, Derrick Stockdale and Tavia Craig Engaged in Similar or More Egregious Conduct and Were Treated More Favorably.**

Plaintiff testified regarding African-American comparators who were loud, disrespectful, and even cursed O'Neal during the same meeting when O'Neal falsely accuses Plaintiff of being disrespectful: "…Derrick Stockdale and Tink and a few others started fussing. And Derrick Stockdale was raising his voice because he wanted to spend time – he had a three-year-old or two-year-old, and he wasn't getting to see his little boy. And Tink was arguing with him. And they were loud. And everybody was talking about how unfair it was." (Doc. 15-1, 73:15-23; 74:11-15; 75:4-9).

"Tink", whose real name is Tavia Craig ("Craig"), raised his voice in the meeting to O'Neal. (Doc. 15-1, 77:21-78:2). Stockdale and Craig were loud and "cussing," using words such as "hell and damn and the 'f' word." (Doc. 15-1, 82:19-83:7). Craig also said he wasn't coming in on Sunday; O'Neal isn't sure if he came in or not. (Doc. 15-2, 90:1-10). Craig is African-American. (Doc. 15-2, 90:10-12).

Neither Stockdale nor Craig was disciplined. (Doc. 17-3).

**J.** **The Record Reflects that Numerous African-American Employees Were Insubordinate and Cursed Supervisors and Received Lesser Discipline Short of Termination.**

Defendant has a progressive discipline policy including stages of verbal warning, written warning, suspension, and discharge. (Doc. 15-2, 47:2-6; Doc. 15-4, 57:14-21). Defendant's document production revealed numerous African American comparators who were insubordinate or disrespectful and were disciplined under Defendant's progressive discipline policy but not terminated. (Doc. 17-4).

On 3/16/2020, for instance, Derrick O'Neal brought Taneesha Williams, who is African American, to the office because after repeated warning she had continued to "verbalize negative opinions about other team members and supervision in a group setting, and did so today, knowing Mr. O'Neal could hear her comments." (Doc. 17-4 p. 2; Doc. 17-3). Williams continued to be insubordinate even after being brought to the office: "When leaving the office area, the employee began to comment, was asked to return to the office, declined, and went back out on the production floor." (Doc. 17-4 p. 2). Despite this insubordination, Williams was not fired and remains employed. (Doc. 17-3).

Similarly, on April 7, 2020, O'Neal overheard Kathy Groce, "using offensive profanity towards her supervisor." (Doc. 17-4 p. 12). Groce, who is African American, was not terminated and remains employed. (Doc. 17-3).

Other African American comparators committed acts of insubordination and disrespect, including such conduct as cursing at supervisors, but were allowed to remain employed; these comparators include Joe Whitson, Tiffany Sim, Daniel Samora, Henry Hill, Latonya Hardy, Maryana Garrett, Brittany Grant, Chanika Emory, and Jonathon Davis, as summarized in the chart below:

| Document Number | Date | Employee | Race (from Legacy 1263-1268, Doc.17-3) | Description |
|---|---|---|---|---|
| Doc. 15-1, 73:15-23; 74:11-15; 75:4-9; 82:19-83:7. | 10/12/2019 | Derrick Stockdale | African American | "Derrick Stockdale was raising his voice because he wanted to spend time – he had a three-year-old or two-year-old, and he wasn't getting to see his little boy." Derrick and Tink were loud and "cussing," using words such as "hell and damn and the 'f' word." |
| Doc. 15-1 82:19-83:7; Doc. 15-2, 90:1-10. | 10/12/2019 | Tavia Craig | African American | Derrick and Tink were loud and "cussing," using words such as "hell and damn and the 'f' word." "Tink" also said he wasn't coming in on Sunday. |
| Doc. 17-4, p. 2 | 3/16/2020 | Taneesha Willaims | African American | Derrick O'Neal brought employee to the HR office to discuss having a negative attitude, and gossiping / instigating bad working relationships on the floor. Mr. O'Neal stated that employee has previously been warned about these issues. Employee has been known to verbalize negative opinions about other team members and supervision in a group setting, and did so today, knowing Mr. O'Neal could hear her comments. Mr. O'Neal explained to employee that this behavior would not be tolerated and longer, and she indicated that she understood, and did not deny any of his statements. When asked if there was anything she would like to add, responded with "no.' When leaving the office area, the employee began to comment, was asked to return to the office, declined, and went back out on the production floor. |
| Doc. 17-4, p. 12 | 4/7/2020 | Kathy Groce | African American | It was observed by Ops Manager Derrick O'Neal that Kathy Groce was using offensive profanity towards her supervisor |

| Doc. 17-4, p. 4-5 | 7/9/2019 | Tavia Slater | African American | documented conversation - Concerning her attitude; employee threatened to go home if manager did not turn fan on. |
|---|---|---|---|---|
| Doc. 17-4, p. 3 | 3/21/2017 | Joe Whitson | African American | Verbal - Attitude towards supervisor must improve; notice states, "employee said he couldn't promise he could go back to work without attitude toward supervisor." |
| Doc. 17-4, p. 6 | 7/24/2014 | Tiffanie Sim | African American | Warning for conduct/demeanor - Must respect lead person and not get an attitude when asked to do something |
| Doc. 17-4, p. 7 | 11/15/2018 | Daniel Samora | Hispanic | Written - Insubordination - must do as told by supervisor or leadsperson |
| Doc. 17-4, p. 8 | 12/4/2018 | Henry Hill | African American | Written - insubordination - Lead person asked him to stop talking and get back on his job. He told her he would when she stops talking. He was told to go to the office and she told him no. |
| Doc. 17-4, p. 9 | 4/26/2016 | Latonya Hardy | African American | verbal - conduct/demeanor towards supervisor must improve |
| Doc. 17-4, p. 10 | 10/11/2018 | Maryana Garrett | African American | Written - Must not have a bad attitude toward management when addressed. Must not use profanity at all. This will be the only warning on profanity toward management |
| Doc. 17-4, p. 11 | 7/12/2017 | Brittany Grant | African American | verbal – must not walk of line without permission, when asked to do something from supervisor or lead person. Must be done without attitude |
| Doc. 17-4, p. 13 | 10/17/2017 | Chanika Emory | African American | Written - insubordination - must do as lead person says |
| Doc. 17-4, p. 14 | 1/8/2019 | Jonathan Davis | African American | Written - must not yell at supervisor, must do as told |

## **Scope of Review**

The appellate Court reviews a district court's grant of summary judgment de novo, "construing the facts and all reasonable inferences from the facts in favor of the nonmoving party." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1170 (11th Cir. 2018).

## Summary of Argument

The trial court correctly recognized that Plaintiff had established a prima facie case of race discrimination. The court also properly found that Plaintiff had pointed to numerous comparators, reasoning that a reasonable jury could find that Plaintiff "was similarly situated to Stockdale and Tink during the Saturday group meeting or to other minority employees that O'Neal called to his office but did not fire." (Doc. 29 at 8). In fact, Plaintiff identified at least fourteen African American comparators who were egregiously disrespectful and insubordinate. Two of these comparators, Stockdale and Craig, were insubordinate and cursing in the very same meeting where Plaintiff spoke up. However, Stockdale and Craig received no discipline whatsoever.

The court also correctly recognized that Defendant's articulated reason for terminating Plaintiff rests on a swearing match between Plaintiff and O'Neal that must be resolved by the jury, not by the Court at summary judgment. (Doc. 29 at 7-8). However, the court erred in concluding that Plaintiff had established only "pretext of something" arising from the factual dispute between Plaintiff and her supervisor regarding the circumstances that preceded her termination. (Doc. 29 at 15). Contrary to the court's reasoning, this is a case in which, as stated by the Supreme Court in *Reeves v. Sanderson Plumbing Prods.*, "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case,

38

suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 147 (2000). "Mendacity" is present here because, accepting the Plaintiff's version of the facts, a reasonable jury must necessarily conclude O'Neal is lying, as the court implicitly recognized by finding that Plaintiff had established "pretext of something."

Moreover, in its pretext analysis, the court improperly disregarded the comparators discussed at the prima facie stage of the court's analysis. Contrary to the district court's reasoning, "[t]he evidence of pretext may include . . . the same evidence offered initially to establish the prima facie case." *Wilson v. B/E Aero., Inc.,* 376 F.3d 1079, 1088 (11th Cir. 2004). After disregarding Plaintiff's comparator evidence at the pretext stage, the trial court instead focused on two white individuals whom O'Neal had disciplined but not fired, erroneously concluding that O'Neal's failure to terminate these white individuals under different circumstances meant he could not have discriminated against Plaintiff. However, a reasonable jury could infer race discrimination from O'Neal's more favorable treatment of African American employees who spoke up in the same meeting as Plaintiff but received no discipline, not to mention the other twelve African American comparators.

Based on these errors, this Court should reverse the district court's order granting summary judgment and remand this case for a jury trial.

## Argument and Citations of Authority.

### A. The Trial Court Correctly Determined that Plaintiff Established a Prima Facie Case of Discrimination Under Either a "Replacement" or a "Comparator" Formulation.

The trial court correctly found Plaintiff "sufficiently established that she was replaced by a non-white employee." (Doc. 29 at 10 fn2). *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 984 (11th Cir. 1989) (holding that "[t]he evidence in this record shows that Hawkins' replacement was the next helper hired, Bennet, and not the man who performed his duties for the next few weeks.") In addition, the trial court correctly concluded that that a reasonable jury could find that Plaintiff "was similarly situated to Stockdale and Tink during the Saturday group meeting or to other minority employees that O'Neal called to his office but did not fire." (Doc. 29 at 8). In evaluating the comparator evidence, the trial court was correct to "accept the Plaintiff's version of the facts drawing all justifiable inferences in Plaintiff's favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008). Accordingly, the trial court correctly held that Plaintiff had established a prima facie case of discrimination.

### B. The Trial Court Erred in Concluding that Plaintiff Had Established Only "Pretext of Something", and in Disregarding Plaintiff's Comparator Evidence at the Pretext Stage.

The trial court erred in concluding, first, that Plaintiff had established only "pretext of something"; the trial court further erred in disregarding Plaintiff's comparator evidence at the pretext stage, instead relying on O'Neal's failure to

terminate two white employees whom he disciplined under different circumstances as evidence foreclosing a finding that O'Neal discriminated against Plaintiff here.

At the outset, this is not a case where Plaintiff seeks to establish discrimination solely through evidence that Defendant's articulated reason is false. Rather, in addition to the "mendacity" of O'Neal's explanation for his decision to terminate her, Plaintiff points to comparator evidence. This includes 1) evidence that O'Neal treated African American employees who also spoke up in the meeting, including Derek Stockdale and Tavia Craig (referred to by the trial court as "Tink") more favorably, not disciplining them for their insubordinate and disrespectful behavior; and 2) evidence that O'Neal gave lesser discipline short of termination to twelve other African American comparators who were egregiously disrespectful and insubordinate, as reflected in the disciplinary records produced after depositions.

### (1)  <u>The Trial Court Erred in Concluding that Plaintiff Had Established Only "Pretext of Something."</u>

As stated by the Supreme Court in *Reeves*,

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt." Moreover, once the employer's justification has been

eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

*Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133, 147-48 (2000) (cites omitted).

The Court went on to sound a cautionary note:

This is not to say that such a showing by the plaintiff will always be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not "'treat discrimination differently from other ultimate questions of fact.'"

Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.* at 148-49.

Similarly, prior to *Reeves*, the Eleventh Circuit held that "once the district court determines that a reasonable jury could conclude that the employer's proffered reasons were not the real reason for its decision, the court may not preempt the jury's role of determining whether to draw an inference of intentional discrimination from the plaintiff's prima facie case taken together with rejection of the employer's explanations for its action." *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106 F.3d 1519, 1538 (11th Cir. 1997).[6] "Even if the jury concludes that all the employer's proffered explanations are unworthy of belief, it may still remain unpersuaded that discrimination was the real reason for the employer's decision. That decision is entrusted to the jury's discretion, but to exercise that discretion, the jury has to get the case." *Id.*; see also *Kragor v. Takeda Pharm. Am., Inc*., 702 F.3d 1304, 1311 (11th Cir. 2012). This does not mean the jury must draw the inference: "'That the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason of race is correct. That remains a question for the factfinder to answer ….' In answering that question, the jury must perform its traditional duties of assessing the credibility of witnesses

---

[6] Although *Combs* was a case arising from the district court's denial of a motion for judgment as a matter of law, ("the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves*, 530 U.S. at 150 (*quoting Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250, 251 (1986))).

through observation of trial testimony and of weighing the evidence -- tasks peculiarly within the province of the jury." *Combs*, 106 F.3d at 1538.

As stated above, the trial court found that Plaintiff had established "pretext of something." This means that the trial court believed (correctly) that Plaintiff had produced sufficient evidence for a reasonable jury to reject the employer's explanations for its action. *Combs*, 106 F.3d at 1538. The trial court did not find that "the record conclusively revealed some other, nondiscriminatory reason for the employer's decision" that would foreclose an inference of discrimination from O'Neal's mendacity about Plaintiff's alleged conduct that formed the basis for his decision to fire her. *See Reeves*, 530 U.S. at 149. The lack of such evidence means the court impermissibly "preempt[ed] the jury's role." *Combs*, 106 F.3d at 1538.

Nor is this a case where, in the formulation of *Reeves*, "the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* Rather, O'Neal's and Plaintiff's versions of the events leading up to her termination are so essentially different that a reasonable jury must inevitably conclude that one or the other of them is lying. O'Neal testified that he terminated Plaintiff "[f]or being insubordinate and disrespectful out on the floor and resulting to name calling." (Doc. 15-2, 106:2-10). He testified that he and Plaintiff were standing at the time clock when he fired Plaintiff. (Doc. 15-2, 80:8-81:7). "She called

44

me stupid three times. After the second time, I said, 'If you continue, I'll be forced to terminate you,' and she did it again." (Doc. 15-2, 88:2-10). Casting doubt on O'Neal's story, Face Frame Supervisor Troy Melton was present at this time, and according to O'Neal's testimony he should have heard his exchange of words with Plaintiff. (Doc. 15-2, 96:11-97:23; Doc. 15-4, 14:19-20). O'Neal told Hanna that he "had to get Troy [Melton] to help him escort her out because she got hostile." (Doc. 15-3, 44:10-15). However, when Hanna asked Melton what happened, Melton's response was "I don't really know, man, I got there at the end." (Doc. 15-3, 44:10-17). Melton's written statement contains nothing about Plaintiff calling O'Neal "stupid," and neither Hanna nor Melton witnessed any confrontation inside the plant; nor did either of them witness any bad behavior from Plaintiff between the time of the meeting, when she and others spoke up, and the termination of her employment. (Doc. 15-4, p. 32; Doc. 15-4, 42:2-21; 54:22-55:2; Doc. 15-3, 46:23-47:23). A reasonable jury could conclude that the reason Melton and Hanna saw nothing and heard nothing is that the alleged behavior never occurred.

Plaintiff wholly disputes O'Neal's account, and instead testified that she said, "That's stupid" only once, only <u>after</u> O'Neal had already told her that she was fired, and only <u>after</u> he had already made the false report over the radio that she was being "irate." (Doc. 15-1, 92:10-16, 101:15-102:4). Plaintiff testified, "I wasn't doing anything. I was just standing there. And when he got on there and said I was being

irate, then I said that was stupid to call and say something that I wasn't doing." (Doc. 15-1, 93:9-17; 95:4-96:5, 102:3-10). The trial court was correct in observing that under the Plaintiff's version of the facts "O'Neal fired Phillips unprovoked, not because Phillips called O'Neal stupid or questioned his management decisions." (Doc. 29 at 12).

If the jury, in the performance of "its traditional duties of assessing the credibility of witnesses through observation of trial testimony and of weighing the evidence," believes Plaintiff's testimony, it will necessarily conclude O'Neal is being mendacious about his reasons for terminating Plaintiff and may disbelieve those reasons. In so doing, the jury may further rely on the comparator evidence discussed below in reinforcing the inference of race discrimination that arises from the falsity of O'Neal's explanation. *See Combs*, 106 F.3d at 1538. Alternately, the jury, after hearing both witnesses, may believe O'Neal and "remain unpersuaded…" *Id.* "[B]ut to exercise that discretion, the jury has to get the case." *Id.*

Based on the above, the trial court erred in finding that a reasonable jury could not infer race discrimination from the falsity of O'Neal's decision to terminate Plaintiff's employment, especially when that mendacity is coupled with the inference of discrimination arising from comparator evidence, as discussed below.

**(2)**   **The Trial Court Erred in Disregarding Plaintiff's Comparator Evidence at the Pretext Stage of the *McDonnell Douglas* Framework.**

"The evidence of pretext may include . . . the same evidence offered initially to establish the prima facie case."   *Wilson v. B/E Aero., Inc.,* 376 F.3d 1079, 1088 (11th Cir. 2004). Here, as stated above, the trial court found at the prima facie stage of the analysis that a reasonable jury could find that Plaintiff "was similarly situated to Stockdale and Tink during the Saturday group meeting or to other minority employees that O'Neal called to his office but did not fire." (Doc. 29 at 8). The trial court then proceeded as if this evidence, having been considered at the prima facie stage, was unavailable to demonstrate pretext. Ignoring the comparator evidence from the Saturday group meeting that it had just considered, the trial court incorrectly stated that "Phillips has no evidence from her incident that would prove that O'Neal fired her because she was white." (Doc. 29 at 14). However, as stated above, the trial court had already found Plaintiff to be similarly situated to either Stockdale or Craig, two African American comparators directly "from her incident."

The trial court's statement that Plaintiff had failed to adduce evidence of race discrimination "from her incident" was incorrect. In fact, Plaintiff argued repeatedly throughout her summary judgment opposition brief that the comparator evidence showing race discrimination included O'Neal's fail to discipline Derek Stockdale and "Tink", whose real name is Tavia Craig, both of whom spoke up in the same

meeting as Plaintiff. Plaintiff argued on pages 23-24 of Plaintiff's brief that she had identified "at least fourteen African American comparators who were treated more favorably by O'Neal and by Defendant" and that "[t]wo of these comparators, Craig and Stockdale, were insubordinate in the very meeting that preceded Plaintiff's termination." (Doc. 18 at 23). Plaintiff argued on pages 25-26 of her brief as follows:

> Plaintiff denies engaging in misconduct such as repeatedly interrupting O'Neal, being disrespectful in the meeting, saying this place is "going to hell," or repeatedly calling O'Neal stupid before she was terminated; accordingly, a reasonable jury could find that O'Neal fired her simply for speaking up in the meeting. But Craig and Stockdale also spoke up in the meeting, and they did so in a far more disrespectful manner than Plaintiff did. They were loud and "cussing," using words such as "hell and damn and the 'f' word." (Doc. 17-1, 82:19-83:7). However, neither of these African American employees was fired. Moreover, even if the Court were to accept O'Neal's framing of Plaintiff's alleged misconduct – that he terminated Plaintiff "[f]or being insubordinate and disrespectful out on the floor and resulting to name calling" – a reasonable jury could still find that Craig's and Stockdale's conduct in the meeting, including being loud and "cussing," constituted "the same basic conduct" that O'Neal cites as the basis for Plaintiff's termination.

(Doc. 18 at 25-26). Plaintiff further argued in the pretext section of her brief that "the jury may further infer both pretext and the 'ultimate fact of intentional discrimination' in violation of Title VII and 42 USC §1981 from the comparator evidence discussed above" (Doc. 18 at 30) and further argued that "showing that Plaintiff's race was the determining or 'but for' factor in O'Neal's differential

treatment of her and her African-American co-workers, O'Neal terminated her for speaking up while allowing Craig, Stockdale, and at least twelve other African American employees who engaged in serious insubordination, including cursing at supervisors, either to escape discipline or remain employed with lesser discipline short of termination." (Doc. 18 at 31). Accordingly, the court could not have been more incorrect in concluding that "Phillips has no evidence from her incident that would prove that O'Neal fired her because she was white." (Doc. 29 at 14).

Given that Plaintiff repeatedly referenced Stockdale and Craig as comparators for the purpose of showing both pretext and race discrimination, the only explanation for the trial court's exclusion of Stockdale and Craig from the pretext analysis is that the trial court erroneously believed that having considered this evidence at the prima facie stage, the Court could not consider the evidence again when evaluating pretext. However, this is contrary to the Eleventh Circuit's dictate that "[a]lthough a plaintiff must both present a prima facie case and show pretext, the showing of pretext need not necessarily involve further evidence; the evidence in a prima facie case might be strong enough to also show pretext." *Ross v. Rhodes Furniture*, 146 F.3d 1286, 1291 (11th Cir. 1998). Here, likewise, the comparator evidence that the trial court considered as establishing a prima facie case also reinforces an inference of pretext.

**(3)    The Trial Court Further Erred in Failing to Recognize that Plaintiff's Comparator Evidence *Is* Evidence of Race Discrimination.**

Evidence that O'Neal failed to discipline Stockdale or Craig also constitutes, in the words of the trial court, "evidence from her incident that would prove that O'Neal fired her because she was white." (Doc. 29 at 14). As stated by the Supreme Court, "the 'normal definition of discrimination' is 'differential treatment.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174, (2005) (quoting *Olmstead v. L. C.*, 527 U.S. 581, 614 (1999)). This means that comparator evidence is evidence of race discrimination. Here, although the trial court found that Plaintiff had established a prima facie case through comparator evidence – including two African-American employees who spoke up disrespectfully and cursed in the same meeting where Plaintiff spoke up but were not terminated, along with at least twelve other African American comparators who were egregiously disrespectful and insubordinate in similar situations – the trial court inexplicably held that "Phillips has no evidence from her incident that would prove that O'Neal fired her because she was white."

In fact, as Plaintiff argued in the passage quoted above, Plaintiff has ample evidence of differential treatment on the basis of race (the definition of "race discrimination," according to the Supreme Court) from O'Neal's more favorable treatment of Craig and Stockdale. At the risk of belaboring the point, Plaintiff once again points out that under her version of the facts, O'Neal fired her simply for

speaking up in the meeting. This is in accordance with the trial court's observation that under the Plaintiff's version of the facts "O'Neal fired Phillips unprovoked, not because Phillips called O'Neal stupid or questioned his management decisions." (Doc. 29 at 12). But Craig and Stockdale also spoke up in the meeting, and they did so in a far more disrespectful manner than Plaintiff did. They were loud and "cussing," using words such as "hell and damn and the 'f' word." (Doc. 17-1, 82:19-83:7). And yet O'Neal did not suspend them on the spot, did not summon them to his office after the meeting, and did not terminate their employment. The trial court, at the prima facie stage of the analysis, concluded that a reasonable jury could find that Plaintiff was "similarly situated in all material respects" to either of these two individuals, neither of whom was fired. (Doc. 29 at 10-12) (analyzing comparator evidence in accordance with *Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019)). Inexplicably, at the pretext stage, the Court completely disregarded Craig and Stockdale as comparators, even though the Eleventh Circuit has repeatedly emphasized that "[a] typical means of establishing pretext is through comparator evidence..." and that "'[e]specially relevant' to a showing of pretext 'would be evidence that [employees outside the protected class] involved in acts against petitioner of comparable seriousness . . . were nevertheless retained or rehired.'" *Walker v. St. Joseph's/Candler Health Sys*., 506 Fed. Appx. 886, 889 (11th Cir. 2013); *Rioux v. City of Atlanta*, 520 F.3d 1269, 1276 (11th Cir. 2008) (*quoting*

51

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (U.S. 1973)). The trial court erred in disregarding Plaintiff's comparator evidence and in finding as a result that Plaintiff has "no evidence from her incident that would prove that O'Neal fired her because she was white." (Doc. 29 at 14). On the contrary, evidence that O'Neal treated Stockdale and Craig more favorably than Plaintiff is evidence of race discrimination – and the trial court erred in failing to consider it in conjunction with the other evidence of pretext and in granting summary judgment to Defendant.

### (4)    The Trial Court Erred in Relying on O'Neal's Failure to Terminate Other White Employees in Different Situations as Precluding an Inference of Race Discrimination Here.

As stated above, the trial court at the pretext stage did not address Stockdale and Craig among Plaintiff's comparators. (Doc. 29 at 13-16). Instead, the court focused on two white individuals, Kelly Pate and Chris Tarwater, whose disciplinary records were contained in Defendant's evidentiary filing. (Doc. 29 at 14) (citing Doc. 15-5 at 15, 5). The trial court reasoned that these disciplinary records showed that O'Neal had "disciplined white employees for similar behavior, without firing them." (Doc. 29 at 14). The trial court appears to have concluded that because O'Neal disciplined but failed to terminate Pate and Tarwater under different factual circumstances, he could not have discriminated against Plaintiff. (Doc. 29 at 14, 17).

In disregarding the two African American comparators whom O'Neal did not discipline for their egregious insubordination in the same meeting where Plaintiff

spoke up, focusing instead on white employees who <u>were</u> disciplined by O'Neal on different occasions, the trial court again usurped the jury's role. As stated by the Supreme Court, "Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employees' group." *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). Moreover, even Pate and Tarwater, the white employees focused on by the district court, were treated less favorably by O'Neal then he treated Stockdale and Craig. Pate and Tarwater received documentation under Defendant's progressive discipline policy, while Stockdale and Craig received zero discipline.

To the extent the district court believed that Plaintiff could only rely on comparators who were disciplined in some fashion or whom O'Neal called to his office for insubordination, resulting in a counseling being entered in the employee's personnel file, (See Doc. 29 at 11-12), the district court erred in imposing such a limitation, which is inconsistent with the trial court's recognition that under Plaintiff's version of the facts "O'Neal fired Phillips unprovoked, not because Phillips called O'Neal stupid or questioned his management decisions." (Doc. 29 at 12). In other words, under Plaintiff's version of the facts, O'Neal fired her simply for speaking up in the meeting. But Craig and Stockdale also spoke up in the meeting, and they did so in a far more disrespectful manner than Plaintiff did. And yet O'Neal did not suspend them on the spot, did not summon them to his office

after the meeting, and did not terminate their employment. A reasonable jury could find that O'Neal treated Stockdale and Craig more favorably because he did not suspend them, call them to his office, or even discipline them for insubordinate and disruptive behavior in the same meeting where Plaintiff also spoke up. See, e.g., *Rawls v. State Dep't of Human Res.*, 507 F. App'x 895, 898 (11th Cir. 2013) ("In the disciplinary context, the plaintiff may show pretext by identifying a similarly situated employee who was not disciplined after engaging in similar conduct as the plaintiff.") Requiring Plaintiff to compare herself only to comparators who, like here, <u>were</u> suspended, called to O'Neal's office, and given written discipline would turn the Eleventh Circuit's "similarly situated" requirement on its head by excluding the most egregious evidence of disparate treatment, i.e. those who received no discipline whatsoever for an offense nearly identical to the alleged offense that, in Plaintiff's testimony, resulted in her termination. Accordingly, to the extent that the Court implicitly adopted such a requirement as its basis for not considering O'Neal's failure to discipline Stockdale and Craig as evidence of pretext, the trial court erred.

## C. <u>The Trial Court Erred in Granting Summary Judgment on Plaintiff's "Mixed Motive" Theory of Relief.</u>

In addition, the trial court erred by granting summary judgment on Plaintiff's "mixed motive" theory of relief.  As stated above, neither Defendant's motion for summary judgment nor its initial reply brief addressed Plaintiff's "mixed motive" theory of relief. (Docs. 14, 16, 19). The Court *sua sponte* issued an order directing

Defendant "to file a brief applying the specific facts of this case to the mixed-motive theory of race discrimination." (Doc. 21). The court then granted summary judgment on Plaintiff's "mixed motive" theory without addressing Defendant's failure to move for summary judgment on that ground. (Doc. 29 at 16-17).

In its summary judgment motion, Defendant acknowledged that "Phillips can survive summary judgment under a mixed motive theory of discrimination by offering 'evidence sufficient to convince a jury' that: (1) Legacy took an adverse employment action against her; and (2) a protected characteristic was a motivating factor for Legacy's adverse employment action." (Doc. 16 at 20). However, despite acknowledging the relevance of the "mixed motive" theory to Plaintiff's claims, Defendant failed to move for summary judgment on this theory of relief. Accordingly, the district court should not have granted summary judgment on this theory. *See, e.g., Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 641 (5th Cir. 2007) (reasoning that under Rule 56, "a district court may not grant summary judgment sua sponte on grounds not requested by the moving party" without giving notice to the party opposing summary judgment; the Fifth Circuit reversed the trial court's order granting dismissal and remanded the case for further proceedings).

The trial court further erred in failing to recognize that even if the jury accepts that Defendant had legitimate reasons for terminating Plaintiff's employment, a jury could still rely on the comparator evidence to find for Plaintiff under Title VII's

"mixed motive" framework, as the trial court correctly recognized that Plaintiff pleaded a "mixed motive" theory of liability in paragraphs 29 and 35 of her complaint. As stated in *Quigg v. Thomas Cnty. Sch. Dist.*: "[d]iscrimination claims brought under Title VII and § 1983 are typically categorized as either mixed-motive or single-motive claims. An employee can succeed on a mixed-motive claim by showing that illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." 43814 F.3d 1227, 1235 (11th Cir. 2016), 42 U.S.C. § 2000e—2(m). In contrast, single-motive claims—which are also known as "pretext" claims—require a showing that bias was the true reason for the adverse action. See *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 251-53, 101 S. Ct. 1089, 1092-93, 67 L. Ed. 2d 207 (1981) (considering a single-motive, gender-based discrimination claim). The Eleventh Circuit in *Quigg* held that the *McDonnell Douglas* framework "is fatally inconsistent with the mixed-motive theory of discrimination because the framework is predicated on proof of a single, 'true reason' for an adverse action..." 814 F.3d at 1237. "In light of this clear incongruity between the *McDonnell Douglas* framework and mixed-motive claims, it is improper to use that framework to evaluate such claims at summary judgment." *Id*. at 1238.

Because this is a mixed motive case, the trial court's task in deciding the present motion was simply to determine "whether the plaintiff has presented

sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that her protected characteristic was a motivating factor for an adverse employment decision." *Quigg*, 814 F.3d at 1239 (emphasis added). Here, based on Defendant's more favorable treatment of the African American comparators, especially Stockdale and Craig, even if the jury accepts that O'Neal legitimately terminated her for speaking up in the meeting, a reasonable jury could still find that Plaintiff's race remained a motivating factor in O'Neal's decision to fire her while issuing no discipline to Stockdale and Craig. See, e.g., *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1343 (11th Cir. 2011) (reasoning that "the great discrepancies in the punishments received by the white non-supervisors in these cases, in contrast to their black peers, yields a reasonable inference that, in the summer of 2005, Heiserman intentionally discriminated against them because they are white.") Accordingly, the trial court erred in not allowing Plaintiff's Title VII wrongful termination claim to proceed under both "mixed motive" and "pretext" theories.

## <u>Conclusion</u>

Based on the above authorities and arguments, the trial court's order granting summary judgment should be reversed, and this case should be remanded for a jury trial.

Respectfully submitted,

*/s/ L. William Smith*

Jon C. Goldfarb
L. William Smith
Christina M. Malmat
Lieselotte Carmen-Burks
Counsel for Plaintiff

## Certificate Of Compliance

I certify that this brief complies with the type-volume limitation set forth in Fed. R. App. P. (32)(a)(7)(B). This brief contains fewer than 13,000 words according to the word-count function of the word-processing system used to prepare the brief.


/s/ L. William Smith
Attorney for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on the date stamped above, a true and correct copy of the above and foregoing document has been properly served via the Eleventh Circuit's electronic filing system to all counsel of record.

/s/ L. William Smith
OF COUNSEL