## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

### No. 22-10057-G
_____

### District Court Docket No.  1:20-cv-01548-CLM

### TERESA PHILLIPS
**Plaintiff-Appellant,**

### v.

### LEGACY CABINETS, LLC
**Defendant-Appellee.**

_____

### APPELLEE'S BRIEF
_____


*/s/ Christine Harding Hart*
MARK T. WAGGONER
CHRISTINE HARDING HART
HAND ARENDALL
HARRISON SALE LLC
104 St. Francis Street, Suite 300
Mobile, Alabama 36602
Telephone:  (205) 432-5511
Email:      chart@handfirm.com
            mwaggoner@handfirm.com

Attorneys for Appellee
Legacy Cabinets, LLC

## <u>APPELLEE'S CERTIFICATE OF INTERESTED PERSONS</u>

The following is a list of persons and entities that have an interest in the outcome of this appeal, as required by Eleventh Circuit Rule 26.1 and Fed. R. App. P. 26.1:

Carmen-Burks, Esq., Lieselotte

Goldfarb, Esq., Jon C.

Hand Arendall Harrison Sale LLC

Harding Hart, Esq., Christine

Legacy Cabinets, LLC

Legacy Cabinets Holdings II, Inc.

Malmat, Esq. Christina M.

Maze, Hon. Corey L.

Phillips, Teresa

Smith, Esq., L. William

Waggoner, Esq., Mark T.

Wiggins, Childs, Pantazis, Fisher
& Goldfarb, LLC

Appellee Legacy Cabinets, LLC hereby discloses that its parent corporation is Legacy Cabinets Holdings II, Inc. No publicly held corporation owns 10% or more of its stock.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendant-Appellee Legacy Cabinets, LLC does not request oral argument and does not believe that it is needed. This case involves the application of substantial Supreme Court and Eleventh Circuit law interpreting federal antidiscrimination statutes. The District Court correctly concluded that Plaintiff-Appellant Teresa Phillips failed to present sufficient evidence to support a finding that her termination of employment was motivated by her race. Moreover, the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

# **TABLE OF CONTENTS**

APPELLEE'S CERTIFICATE OF INTERESTED PERSONS ............................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................ i

TABLE OF CONTENTS........................................................ ii

TABLE OF AUTHORITIES ................................................. iv

STATEMENT OF JURISDICTION.........................................1

STATEMENT OF THE ISSUES...........................................1

STATEMENT OF THE CASE...............................................2

    (i)    COURSE OF PROCEEDINGS AND
           DISPOSITIONS BELOW ................................................2

    (ii)    STATEMENT OF THE FACTS ......................................3

              I.    Background and Events Leading to Phillips's
                      Termination of Employment. ........................... 3

              II.    Phillips's Evidence Regarding Comparators
                      Fails to Infer Intentional Race Discrimination............................. 17

    (iii)    STATEMENT OF THE STANDARD OF REVIEW..............................23

SUMMARY OF THE ARGUMENT ....................................................23

ARGUMENT ......................................................................26

    I.    Phillips Failed to Establish a Prima Facie Case ......................................28

    II.    Legacy Had Non-Discriminatory Reasons for
          Terminating Phillips's Employment and There is no
          Evidence of Pretext.....................................................30

    III.    Phillips Has No Evidence of Discriminatory Intent.................................35

    IV.    Phillips Should Not Survive Summary Judgment
          Solely Based on Her Prima Facie Case ....................................39

V.     Phillips Cannot Assert a Mixed-Motive Theory, But
       Even So, She Lacks Evidence of Discriminatory
       Intent to Overcome Summary Judgment ..................................................42

       A.     Legacy moved for summary judgment as to the
              mixed-motive theory ..................................................... 42

       B.     Phillips does not factually establish a mixed-
              motive theory.................................................................. 44

       C.     Even under a mixed-motive theory, Phillips's
              comparator evidence does not infer
              discrimination ................................................................. 47

CONCLUSION .................................................................................................49

CERTIFICATE OF COMPLIANCE....................................................................51

CERTIFICATE OF SERVICE ...........................................................................51

iii

# TABLE OF AUTHORITIES

## Cases

*Abram v. Von Maur, Inc.*,
    719 F. App'x 929 (11th Cir. 2018)..................................................28

*\*Alvarez v. Royal Atlantic Developers, Inc.*,
    610 F.3d 1253 (11th Cir. 2010)...................................................33

*Baldwin v. Blue Cross/Blue Shield of Alabama*,
    480 F.3d 1287 (11th Cir. 2007)...................................................38

*Benjamin v. SNF Holding Co.*,
    602 F. App'x 758 (11th Cir. 2015)..............................................45

*Bowen v. Manheim Remarketing, Inc.*,
    882 F.3d 1358 (11th Cir. 2018)...................................................47

*Boyle v. City of Pell City*,
    866 F.3d 1280 (11th Cir. 2017)...................................................23

*\*Brown v. Jefferson County Sheriff's Dep't*,
    806 F. App'x 698 (11th Cir. 2020)................................... 38, 40, 41

*Burrell v. United Parcel Serv., Inc.*,
    No. 7:19-CV-01704-LSC, 2021 WL 4894607, at *6 (N.D. Ala.
    Oct. 20, 2021) ...............................................................49

*Burton v. City of Belle Glade*,
    178 F.3d 1175 (11th Cir. 1999)...................................................44

*Burton v. Gwinnett County School District*,
    No. 1:16-cv-03775-LMM-WEJ, 2018 WL 10398907, at *1
    (N.D. Ga. Feb. 7, 2018) ...................................................... 43, 44

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................44

*Chapman v. Al Transp.*,
    229 F.3d 1012 (11th Cir. 2000) ............................................ 32, 33

iv

*Combs v. Plantation Patterns*,
106 F.3d 1519 (11th Cir. 1997) .......................................................32

*Comcast Corp. v. Nat'l Ass'n of African-Am.-Owned Media*,
589 U.S. __, 140 S. Ct. 1009 (2020) ..................................... 26, 39

*Conner v. Fort Gordon Bus Co.*,
761 F.2d 1495 (11th Cir. 1985) .......................................................31

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003)..........................................................................47

*Flowers v. Troup Cty., Ga., Sch. Dist.*,
803 F.3d 1327 (11th Cir. 2015) ................................... 31, 34, 40, 42

*Fonte v. Lee Memorial Health System*,
No. 2:19-cv-54-FtM-38NPM, 2020 WL 4596872, at *3 (M.D.
Fla. Aug. 11, 2020) .........................................................................46

*Hayes v. Deluxe Mfg. Ops. LLC*,
No.1:16-cv-2056-RWS-RGV, 2018 WL 1461690, at *25 (N.D.
Ga. Jan. 9, 2018) .............................................................................35

*Hill v. Houchens Food Group, Inc.*,
No. 1:19-cv-103-KD-C, 2020 WL 2750366, at *10 (S.D. Ala.
May 27, 2020)..................................................................................29

*Howard v. BP Oil Co.*,
32 F.3d 520 (11th Cir. 1994) ................................................... 24, 32

*Jackson v. City of Killeen*,
654 F.2d 1181 (5th Cir. 1981) ........................................................40

*Jackson v. State of Ala. St. Tenure Comm'n*,
405 F.3d 1276 (11th Cir. 2005) ......................................... 24, 32, 34

*Jones v. Unity Behavior Health, LLC*,
No. 9:19-cv-81341-ROSENBERG, 2020 WL 6731679, at *7
(S.D. Fla. Oct. 13, 2020)..................................................................45

*Lee v. Safe-Dry Carpet & Upholstery*,
No. 20-14275, 2021 WL 3829028, at *4-5 (11th Cir. Aug. 27,
2021) ..............................................................................................42

*Lewis v. City of Union City,
918 F.3d 1213 (11th Cir. 2019) ("*Lewis I*") .......................................... passim

*Lewis v. City of Union City, Ga.*,
934 F.3d 1169 (11th Cir. 2019) ("*Lewis II*") ......................................... 25, 38

Little v. Star Asia International, Inc.,
No. 1:20-cv-397-WMR-JKL, 2021 WL 4815897, at *13 (N.D.
Ga. Mar. 10, 2021) ............................................................................. 45

Lockaby v. United Testing Grp., Inc.,
986 F. Supp. 1400 (N.D. Ga. 1997) .................................................. 12

Luke v. Univ. Health Servs., Inc.,
No. CV 117-125, 2019 WL 4670757, at *9 (S.D. Ga. Sept. 24,
2019) .................................................................................................. 41

Matthews v. City of Mobile,
No. 14-cv-601-KD-N, 2016 WL 1736061, at *11 (S.D. Ala.
May 2, 2016) ..................................................................................... 31

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ...................................................................... passim

Muniz v. Dynamic Sys., Inc.,
No. CV 117-074, 2019 WL 4439816, at *9 (S.D. Ga. Sept. 16,
2019) .................................................................................................. 40

Nix v. WLCY Radio/Rahall Communication,
738 F.2d 1181 (11th Cir. 1984) ......................................................... 34, 41

Okwan v. Emory Healthcare Inc.,
No. 20-11467, 2021 WL 4099236, at *6 (11th Cir. Sept. 9,
2021) .................................................................................................. 49

Peppers v. Cobb County, Ga.,
835 F.3d 1289 (11th Cir. 2016) ........................................................ 23

Perryman v. Johnson Prods. Co.,
698 F.2d 1138 (11th Cir. 1983) ........................................................ 31

*Quigg v. Thomas Cty. Sch. Dist.*,
814 F.3d 1227 (11th Cir. 2016) ................................................ 27, 45, 47, 48

*Reeves v. Sanderson Plumbing Prod., Inc.*,
530 U.S. 133 (2000).........................................................................40

*Rojas v. Florida*,
285 F.3d 1339 (11th Cir. 2002) ....................................................33

*Sanders v. Mercedes-Benz U.S. Int'l, Inc.*,
No. 7:17-CV-01253-LSC, 2019 WL 330145, at *4 (N.D. Ala.
Jan. 25, 2019).............................................................................38

*Siddiqui v. NetJets Aviation, Inc.*,
773 F. App'x 562 (11th Cir. 2019) ..............................................41

*Skelton v. Birmingham Airport Auth.*,
No. 2:18-CV-01240-CLM, 2020 WL 5632973, at *4 (N.D. Ala.
Sept. 21, 2020)............................................................................27

*Smith v. Lockheed-Martin Corp.*,
644 F.3d 1321 (11th Cir. 2011) ....................................................27

*Smith v. Vestavia Hills Bd. of Educ.*,
791 F. App'x 127 (11th Cir. 2019)..............................................45

*\*St. Mary's Honor Ctr. v. Hicks*,
509 U.S. 502 (1993)................................................................ 31, 35

*Stevenson v. City of Sunrise*,
No. 20-12530, 2021 WL 4806722, at *5-6 (11th Cir. Oct. 15,
2021) ...........................................................................................46

*Taylor v. Polygram Records*,
No. 94 CIV.7689(CSH), 1999 WL 124456, at *10 (S.D.N.Y.
March 8, 1999).............................................................................35

*Tebo v. City of DeBary, Fla.*,
784 F. App'x 727 (11th Cir. 2019)..............................................30

*Tex. Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248 (1981)......................................................................27

*Vaughn v. Sizemore, Inc.*,
No. 5:17-cv-1528-LCB, 2019 WL 5963615, at *18 (N.D. Ala.
Nov. 13, 2019) ............................................................................45

*Wesley v. Austal USA, LLC*,
    776 F. App'x 638 (11th Cir. 2019) .................................................................34

*White v. Baxter Healthcare Corp.*,
    533 F.3d 381 (6th Cir. 2008) .........................................................................48

*Willis v. Koch Agronomic Servs.*, LLC,
    846 F. App'x 787 (11th Cir. 2021) ................................................................40

*Wilson v. B/E Aerospace, Inc.*,
    376 F.3d 1079 (11th Cir. 2004) ........................................................... 33, 38

*Worley v. City of Lilburn*,
    408 F. App'x 248 (11th Cir. 2011) ................................................................25

## Statutes

28 U.S.C. § 1291 .................................................................................................1

28 U.S.C. § 1331 .................................................................................................1

42 U.S.C. § 1981 ................................................................................. 2, 26, 39

42 U.S.C. § 2000e-2.........................................................................................47

## Rules

Federal Rule of Civil Procedure 56 .......................................................................23

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as Plaintiff-Appellant Teresa Phillips asserted federal civil rights claims. (Doc. 1.) This Court has jurisdiction over Phillips's appeal pursuant to 28 U.S.C. § 1291. This appeal is from a final judgment entered December 29, 2021 that disposed of all of Phillips's claims against Defendant-Appellee Legacy Cabinets, LLC on summary judgment. (Docs. 29 & 30.) Phillips filed her notice of appeal on January 7, 2022. (Doc. 31.)

## STATEMENT OF THE ISSUES

I.    Did the District Court err in finding that Phillips established a prima facie case of discrimination on the basis of comparator evidence?

II.   Should the District Court have determined that Phillips failed to demonstrate that the reasons for her termination of employment were false?

III.  Did the District Court correctly find that Phillips failed to present evidence that her employment was terminated because of her race?

IV.   Did the District Court correctly disregard Phillips's mixed-motive theory of discrimination because of the lack of evidence of discriminatory intent?

## **STATEMENT OF THE CASE**

### **(i) COURSE OF PROCEEDINGS AND DISPOSITIONS BELOW**

Plaintiff-Appellant Teresa Phillips ("Phillips") filed an EEOC Charge on November 8, 2019, which she supplemented on December 19, 2019, alleging age and race discrimination in connection with her termination of employment from Defendant-Appellee Legacy Cabinets, LLC ("Legacy"). (Doc. 1-1.) Phillips filed her lawsuit in the District Court against Legacy on October 5, 2020 for race discrimination, alleging violations of Title VII of the Civil Rights Act and 42 U.S.C. § 1981. (Doc. 1.) Legacy answered on November 2, 2020 (Doc. 4), and discovery proceeded until May 7, 2021. (*See* Doc. 13, p.1.)

Legacy moved for summary judgment on June 7-9, 2021. (Docs. 14-16.) Phillips responded in opposition on June 17 and 18. (Docs. 17 & 18.) Legacy filed its reply brief on July 2, 2021. (Doc. 19.)

In the District Court's October 18, 2021 Order (Doc. 21, Docket Text), the Court ordered Legacy "to file a brief applying the specific facts of this case to the mixed-motive theory of discrimination." Legacy filed its brief on November 5, 2021 (Doc. 22), asserting that summary judgment was due to be granted even under a mixed-motive theory because there is no evidence that discrimination was a motivating factor in the employment decision. Phillips filed a response on November 9, 2021, asserting that "this is a 'mixed motive' case" and that Legacy

2

failed to move on that theory, and that summary judgment should be denied. (Doc. 25). Legacy filed a reply brief regarding the matter on November 15, 2021, confirming that it had raised the argument in its principal summary judgment motion, but that this was not a mixed-motive case. However, under any theory of discrimination, Phillips lacked the required evidence of discriminatory intent to avoid summary judgment. (Doc. 28.)

The District Court granted Legacy's motion for summary judgment and entered judgment on December 29, 2021. (Docs. 29 & 30.) Phillips filed her notice of appeal on January 7, 2022. (Doc. 31.)

## (ii) STATEMENT OF THE FACTS

## I.    <u>Background and Events Leading to Phillips's Termination of Employment.</u>

Legacy Cabinets, LLC is a cabinet manufacturer that employs approximately 500 employees at its plant in Eastaboga, Alabama. (Doc. 1, p.2.) The room where Phillips worked ("Paint Room 3") was racially diverse; of the 41 employees, 26 were black, 8 white, and 7 Hispanic. (Doc. 17-1; Doc. 15-4, p.18 (59:14-17).)

Phillips (white female) began working at Legacy through a staffing agency in September 2013. (Doc. 15-1 (Deposition of Teresa Phillips), pp. 9 (28:4-5), 11 (36:1-37:7), 70 (Ex. 6).)  She was hired to work directly for Legacy on or around January 2014. (Doc. 15-1, p.12 (38:10-39:1).)

Phillips had access to Legacy's employee handbook and signed an acknowledgment that she received it. (Doc. 15-1, pp.12 (38:5-19), 46-69 (Exs. 4 & 5).) She reviewed the handbook and understood that Legacy employees could be terminated for insubordination, disruptive conduct, or profanity. (Doc. 15-1, pp.12 (39:8-40:1), 52-54 (Ex. 4).) The handbook states that conduct such as "deliberately interfering with operations," "insubordination or refusal to carry out any instruction from a supervisor," and "profanity" could result in disciplinary action "up to and including immediate termination of employment." (Doc. 15-1, pp.52-53.)

Phillips worked primarily in Paint Room 3 during her employment at Legacy. (Doc. 15-1, p.12 (40:2-16).) Within Paint Room 3, Phillips's last assignment was to do inspections and repairs of the cabinets. (Doc. 15-1, pp.12-13 (41:1-42:7, 43:1-3); Doc. 15-3 (Deposition of Shane Hanna), pp.7-8 (17:18-19:10).) The paint room consists of a "hanging line," where Phillips was assigned, as well as two "flat lines." (Doc. 15-1, p.13 (43:16-23).) The hanging line consisted of 15-18 people, and Phillips was the third person on the line before the cabinets entered the paint booth. (Doc. 15-1, p.13 (43:7-15).) Derrick O'Neal, an operations manager who supervised Paint Room 3 and the face frame department, and the manager who decided to terminate Phillips's employment, testified that

Phillips was a good worker.[1] (Doc. 15-2 (Deposition of Derrick O'Neal), pp.17 (56:4-5), 19 (63:1-6).)

Phillips worked with several other individuals on the hanging line of diverse race and gender, including Brandi Dark (black female), Shanta Curry (black female), Derrick Stockdale (black male), Tavia Craig a.k.a. "Tink" (black male), Maria Ortiz (Hispanic female), Ana Jimenez (Hispanic female), Luke Keith (black male), Henry Sheppard (black male), Jay Silinski (white male), Matthew Hyatt (white male), and Stephen McGuirk (white male). (Doc. 15-1, pp.13-14 (45:2-47:19, 48:17-49:12), 88-89 (Ex. 11); Doc. 15-2, p.18 (60:10-21); Doc. 15-3, pp.17-18 (57:14-58:5 & 66:2-5), 20 (67:16-68:5).) Phillips worked closely with Dark and Curry on the front of the line. (Doc. 15-2, p.20 (66:6-67:4).)

Shane Hanna (white male) was the line leader (assistant supervisor) for the hanging line in Paint Room 3. (Doc. 15-1, p.15 (51:3-16), Doc. 15-2, pp.17-18 (54:5-10 & 59:7-11); Doc. 15-3, p.7 (14:7-11); Doc. 15-4 (Deposition of Troy Melton), p.18 (59:14-17).)

O'Neal was familiar with Legacy's policies, including the disciplinary policies. (Doc. 15-2, p.15 (47:2-20).) O'Neal had the authority to fire line employees, including Phillips. (Doc. 15-2, p.12 (34:7-17).) O'Neal disciplined

---

[1] O'Neal reported to the Plant Manager, Craig Watts (white male). (Doc. 15-2, p.11 (30:13-21).) O'Neal resigned from Legacy in September 2020. (Doc. 15-2, p.15 (47:21-48:23).)

several employees during his employment, including other white employees, typically due to insubordination, absences, tardiness, or abuse of breaks. (Doc. 15-2, p.33 (35:12-19); Doc. 15-5., pp.2-35 (disciplinary records and demographic information).) He testified that he has terminated other employees, often for failing to report to work without calling. (Doc. 15-2, p.33 (118:9-119:2).) Typically, when disciplining employees, O'Neal would write up the issue, take it to human resources for their review, and then bring the employee to human resources and give them a copy of the disciplinary record. (Doc. 15-2, p.12 (36:15-21).)

Phillips testified that she never had a one-on-one conversation with O'Neal before the day she was terminated;[2] O'Neal had only begun supervising Paint Room 3 two or three weeks prior. (Doc. 15-1, p.15 (51:17-23).) Phillips did not think O'Neal was a good manager because "[h]e wasn't patient. He was rude," "[h]e didn't want to talk with anybody that had problems. And he even stated that if we had any problems, to go to Shayne [Hanna]. He didn't want to hear it." (Doc. 15-1, p.15 (52:3-11).) According to Phillips, other Legacy employees had

---

[2] Phillips later testified that she spoke with O'Neal about not being able to work two Sundays a month. She testified that "he told me he didn't care. He didn't have time to talk about it. He said: Talk to Shayne [Hanna]." (Doc. 15-1, p.15 (52:12-53:5).) Nevertheless, Phillips had been absent several days before her termination, due to family obligations and health issues, and many of those absences were unexcused. (Doc. 15-1, pp.17-18 (61:15-65:20).) She was not disciplined for those absences. (Doc. 15-1, p.19 (68:11-20).)

problems with O'Neal, including Derrick Stockdale (black male). (Doc. 15-1, p.7 (18:4-11).)

Hanna testified he did not get along with O'Neal all the time, that O'Neal "had a bad case of micromanaging and not letting me run the paint room like it was supposed to be ran." (Doc. 15-3, pp.15-16 (49:20-50:2).) Hanna did not think O'Neal talked to him disrespectfully, but rather that O'Neal "felt he knew more than anybody else." (Doc. 15-3, p.16 (51:3-9).) Hanna never had any conversations with O'Neal about politics or race. (Doc. 15-3, p.16 (51:10-22).)[3] Hanna does not think that O'Neal had issues with him being white, because "he always seemed to treat everybody equally. You know, you might not like what he was doing, but people equally didn't like what he was doing." (Doc. 15-3, p.17 (56:2-11).)

At the time of Phillips's termination in October 2019, the plant, including Paint Room 3, was busy. (Doc. 15-1, pp.15-16 (52:17-55:23).) Legacy had supply chain issues with tariffs on goods from China, and the company had decided to build more frames instead of purchasing them. (Doc. 15-2, p.13 (39:23-40:21), Doc. 15-4, p.11 (30:17-31:19).) The frame department was working around the clock. (Doc. 15-2, pp.31-32 (112:12-113:3, 115:6-17); Doc. 15-4, p.7 (14:13-20).)

---

[3] Troy Melton, the supervisor in the face frame department, testified that he probably spoke with O'Neal about politics or non-work matters, but he could not remember any details. (Doc. 15-4, p.8 (20:13-19).) Melton was written up by O'Neal for failing to follow procedures; Melton agreed that the discipline was justified. (Doc. 15-4, p.8 (18:5-19:5).)

The hours in the paint room varied depending on the timing of when the frames were built and needed to be painted before they were assembled. (Doc. 15-2, pp.13-14 (41:3-42:17), Doc. 15-4, pp.11-12 (32:7-34:5).) Paint Room 3 was working a lot of Saturdays and Sundays. (Doc. 15-3, p.9 (25:3-6).) And there was high turnover at the facility. (Doc. 15-2, p.14 (42:20-43:19).)

A couple of days before Phillips's termination, she was awarded a $10 gift card to Chick-fil-A from O'Neal, "[f]or doing a good job." (Doc. 15-1, p.16 (57:1-5); Doc. 15-2, pp.17-18 (56:6-58:22); Doc. 15-3, p.12 (35:23-36:22).) The women she worked next to, Dark and Curry, also received gift cards. (Doc. 15-1, p.16 (57:14-17).)

The weekend of October 11 and 12, 2019 was "race weekend" at the Talladega speedway. (Doc. 15-1, pp.16-17 (57:22-58:12).) On Friday, October 11, O'Neal called a meeting (a "huddle" as it was called[4]) of Paint Room 3 and told them they were going to work four hours Saturday and be off Sunday because it was hard to get in and out of the plant due to the race.[5] (Doc. 15-1, pp.17 (58:4-12),

---

[4] There was a "huddle," or meeting, every morning to let the room know what needed to be done by the end of the day, and there was a huddle again at lunch with an update to inform everyone what time they expected to be done with their work for the day. (Doc. 15-2, p.19 (64:4-65:5).)

[5] Phillips asserted in the District Court and in her Appellant's Brief that, according to her testimony, on Friday night (not Saturday) O'Neal decided that Paint Room 3 would work Sunday. (Appellant's Corrected Br. at 24.) However, Phillips clarified in her deposition that on Friday evening O'Neal told them they would work four

22 (79:21-80:2).) At the Friday meeting, Jay Silinski responded that it was "BS" and that he wasn't coming in, and indeed he did not come to work on Saturday. (Doc. 15-1, pp.22 (78:3-80:9), 97.) Tavia Craig ("Tink") and Stockdale also spoke up, and according to Phillips everyone was verbally agreeing that it was not right that they had to work over the weekend. (Doc. 15-1, pp.22-23 (81:21-82:12).)

On Saturday, October 12, 2019, the day of Phillips's termination, she worked with the rest of Paint Line 3. (Doc. 15-1, p.16 (57:18-23).) Several employees on the line reported late to work or were absent. (Doc. 15-1, pp.19-20 (69:21-70:23).) O'Neal testified that the day "got off to a rocky start" and started late because of attendance, and that he had to borrow people from the other paint rooms to start the line. (Doc. 15-2, pp.20-21 (69:22-71:21) ("It was just a disaster Saturday."); *see also* Doc. 15-3, p.9 (24:16-21).) Shane Hanna was late. (Doc. 15-3, pp.9-10 (25:12-27:11).) Derrick Stockdale was late, and Jay Silinski and Ana Jimenez did not report to work.[6] (Doc 15-1, pp.20 (70:5-23), 92-93, 97.) O'Neal told Craig ("Tink") to call Stockdale in, which he did, and Stockdale came in. (Doc. 15-1, p.20 (72:1-12).) Stephen McGuirk was late on October 12 because of

---

hours Saturday and be off Sunday; on Saturday they learned that they had to work Sunday. (Doc. 15-1, pp.21-22 (74:11-75:9, 79:16-80:3).)
[6] Phillips testified that Luke Keith did not work on October 12 but time records indicate that he worked that day, arriving late. (Doc. 15-1, p.92.)

a personal obligation.[7] (Doc. 15-1, p.90; Doc. 15-2, p. 30 (107:15-108:4); Doc. 15-3, pp.17-18 (57:14-58:5).)

At the manager meeting that day, Plant Manager Craig Watts and O'Neal agreed that Paint Room 3 would have to work on Sunday because they were behind. (Doc. 15-2, p.21 (70:13-72:5).) After the manager meeting, O'Neal called a "huddle" on Saturday evening with everyone in Paint Room 3 to inform them that they were shutting the line down for the night and would need to work Sunday, October 13. (Doc. 15-1, p.20 (73:11-75:9); Doc. 15-2, p.21 (70:13-72:14); Doc. 15-3, pp.10 (27:19-28:9), 11 (31:19-33:7).)

At the huddle, according to Phillips, Craig ("Tink") and Stockdale were loud and cussing that they did not want to work Sunday. (Doc. 15-1, p.23 (82:19-17).) Hanna did not remember any cuss words from Stockdale or Craig, just "a lot of huffing and puffing." (Doc. 15-3, p.15 (48:22-49:2).) O'Neal testified that "there was a bunch of moaning and groaning," which he said was normal under the circumstances. (Doc. 15-2, p.21 (72:6-14); *see also* Doc. 15-3, pp.11-12 (33:17-34:1) ("there was a lot of huffing and puffing").) Hanna testified that Craig ("Tink") was upset because they were told before Saturday that they wouldn't have

---

[7] Phillips contends that no one was disciplined for being late or not reporting to work, and that O'Neal was joking with Derrick Stockdale when he came in late. (Doc. 15-1, p.20 (71:20-72:12).) There is no indication that any other employees were disciplined by O'Neal in connection with their attendance on October 12; nevertheless, several employees of diverse race were either absent or late.

to work Sunday, and that he thought the work could be completed Saturday; Hanna reminded Craig of how much work there was left to do. (Doc. 15-3, pp.10-11 (29:9-30:7).)

Phillips testified: "everybody was mumbling and said they didn't want to work and stuff, and I was just shaking my head agreeing with the crowd, he [O'Neal] was walking – he started walking through the crowd. An[d] he said: Have you got something you want to say? And I told him it was unfair." (Doc. 15-1, p.23 (83:18-84:5).) She further testified: "I told him that I didn't think it was right, we was all tired, we had been working long hours." (Doc. 15-1, pp.23-24 (85:18-86:3).) She "just agreed that it was unfair that we had been working these late hours and long weeks. And that's basically it." (Doc. 15-1, p.23 (84:6-10).) Phillips testified that she spoke "[p]robably like a minute or two." (Doc. 15-1, p.23 (84:11-19).) (Emphasis added.)

Then, according to Phillips, O'Neal "started blowing up" and according to Phillips said "he was mainly fussing at me about everything and then telling me that he could do whatever he wanted in the state of Alabama. And then he just stops and tells everybody to go home and told me to not go anywhere." (Doc. 15-1, p.23 (85:4-11).)

Hanna testified that at the huddle Phillips said that O'Neal could not make them work because they had already put in their hours. (Doc. 15-3, p.12 (34:4-8).)

And according to Hanna, which Phillips did not dispute, O'Neal told Phillips that he could fire her on the spot, and that Phillips said that was fine. (Doc. 15-3, p.12 (34:14-19).) "[I]t was – kind of come off disrespectful when [O'Neal is] trying to have a meeting and explain it to everybody, and she – you know, every time that he would say something, she had something to say back. And he told – basically, I think there was a time in there where he told her, you know, that's enough for right now. And she didn't stop, and that's when he told her that she could come with him after it was over with. And she said that she was ready."[8] (Doc. 15-3, p.15 (47:12-48:3).)

O'Neal testified that Phillips and a couple more guys, including Craig ("Tink") kept interrupting him while he was trying to deliver the message at the huddle, and so O'Neal asked everyone to let him finish delivering the message and then take questions. (Doc. 15-2, pp.21 (72:6-23), 25-26 (89:12-90:9).) "Everyone except for Teresa kind of backed off and let me finish talking. She kept interrupting saying it's against the law, that you can schedule us to work on Sunday." (Doc. 15-2, p.21 (73:1-8).) He further testified:

---

[8] Phillips asserted to the District Court, including in her own declaration, and argues here on appeal that she was not "disrespectful" or "insubordinate." However, Phillips's declaration testimony that she was not disrespectful and did not interrupt O'Neal is no more than her personal opinion and is insufficient evidence of pretext. *Lockaby v. United Testing Grp., Inc.*, 986 F. Supp. 1400, 1403 (N.D. Ga. 1997) (citations omitted) ("An employee's allegations, opinions and conclusory statements are insufficient to show intent to discriminate[.]")

So, you know, I was trying to explain to them, "Look, you know, let's come in and try to work maybe four or six hours and get out of here before the race is over with so we can beat the traffic," but she just kept interrupting. So I seen that she wasn't going to let me finish, so I just kept talking and I asked everyone did they have any questions. And it was said, "Why we got to work?" I said, "Guys, I just explained to you because we're not where we need to be, so we got to get to where we need to be."

I said, "People didn't come in on time this morning, some people didn't show up at all, and some people came in late. So that's throwing us off." So I said, "Everybody come in for a day to try to get out of here before the race gets here." So everybody said okay. They walked off with a mumble, grumble, which is normal.

So I told Teresa, I said, "Come a little closer to me so you can have a conversation," and that's when she went to telling me that she's not coming. I said, "That's fine." I said, "This is not a prison, I can't make you come to work. I can schedule a workday, and it's up to you to come or not." I said, "But it's my job to let you know that we are scheduled to work so you can't say that you didn't know that we were scheduled."

And at that point, I was kind of shocked at the attitude that she was displaying because I have never seen her act this way. So I said, "Come on, let's go up to the office and talk."

(Doc. 15-2, pp.21-22 (73:18-75:6), *see also* p.34 (124:1-16).)

After the huddle on Saturday October 12, O'Neal and Hanna brought Phillips to O'Neal's office and suspended her until the following Monday.[9] (Doc. 15-1, pp.24-25 (89:22-90:7).) On the walk to the office Phillips kept saying that it was illegal to work on Sundays, which Phillips does not dispute. (Doc. 15-2, p.26

---

[9] Phillips initially described this as her being "terminated until Monday when HR got there, and they would decide what to do with me," but later described it as a suspension. (Doc. 15-1, pp.24-25 (89:22-90:13).)

(92:20-93:7); *see also* Doc. 22 (not disputing Doc. 16, p.13 ¶ 22).) She also said (which she did not dispute when opposing summary judgment) that O'Neal did not know how to talk to people or how to treat people. (Doc. 15-3, pp.12 (35:7-10), 39-40 (Ex. 3); *see also* Doc. 18, p.5 ¶ 22 (not disputing Doc. 16, p.13 ¶ 22)) O'Neal told Phillips, and she does not dispute this account, that he was not firing her, but that Phillips was being disrespectful and so he was going to let her go home, think about it, and come back Monday. (Doc. 15-2, pp.22 (75:9-77:9), 26 (91:19-92:8); *see also* Doc. 18, p.5 ¶ 22 (not disputing Doc. 16, p.13 ¶ 22).)

When they left the office after Phillips was suspended, O'Neal and Phillips walked back towards Paint Room 3, and Hanna walked elsewhere. (Doc. 15-1, pp.24-25 (89:21-91:1), 25 (91:23-92:21).) O'Neal was behind Phillips "a couple of steps. And then he went around [her] since he was walking faster than [she] was." (Doc. 15-1, p.25 (91:23-92:21).) O'Neal referenced the gift card he awarded Phillips and that he thought she was a good worker, to which she responded that she was a good worker and that she still had the gift card if he wanted it back. (Doc. 15-1, pp.26-27 (97:13-98:3, 99:12-100:3); Doc. 15-2, p.27 (94:11-19); Doc. 15-3, p.12 (35:11-22, 37:12-21); *see also* Appellant's Corrected Br. at 28.)

O'Neal testified that on the walk from his office Phillips called him stupid on three occasions, and that he warned her that if she called him stupid again, he would be forced to terminate her because she's crossing the line. (Doc. 15-2,

pp.22-23 (77:18-78:5), 25 (87:15-88:10), 29 (104:6-105:3).) O'Neal testified that Phillips responded: "You are stupid, and this place is going to shit." (Doc. 15-1, pp.22-23 (77:18-78:5), 29 (103:19-104:5); *see also* p.58 (Ex. 2).) O'Neal then told her that she just fired herself and asked her to leave.[10] (*Id*.)

According to Phillips, as they were leaving the office, O'Neal referenced the gift card, and Phillips told him he could have it back, and that O'Neal then turned around, put a finger in her face, and told her she was fired. (Doc. 15-1, pp.25-27 (91:23-98:3), 27-28 (99:12-102:4).)

Phillips testified that O'Neal got on his radio while they were walking but she didn't know who he was talking to. (Doc. 15-1, p.25 (91:23-92:21).) O'Neal told the person on the radio that he needed backup and that Phillips was being irate. (Doc. 15-1, pp.24-25 (89:21-91:1), 27-29 (94:21-95:15 & 101:21-102:4).) He also said on the radio that Phillips was calling him stupid. (Doc. 15-1, p.26 (91:23-92:21 & 93:9-17).)[11] Phillips testified, "I wasn't calling him stupid. I said what he done was stupid." (Doc. 15-1, p.26 (91:23-92:21).) According to Phillips, she made the "stupid" comment after O'Neal had already fired her. (Doc. 15-1, p.28 (102:2-4).)

---

[10] O'Neal told Hanna later that Phillips became hostile and that he had to terminate her. (Doc. 15-3, pp.39-40 (Ex. 3).)

[11] O'Neal radioed the Plant Manager Craig Watts to tell him he was taking Phillips to the office; Watts told O'Neal that he expected him to deal with it. (Doc. 15-2, pp.22 (75:9-21), 29 (102:13-103:10).)

Phillips took her time leaving the property to tell co-workers that she had been fired; O'Neal told her that if she continued, he would have to call the local police to escort her off the property. (Doc. 15-1, p.29 (103:21-104:15); Doc. 15-2, pp.23 (78:6-22), 25 (86:11-87:9), 33 (120:23-121:18).)

After Phillips returned to Paint Room 3 and gathered her things, O'Neal and Troy Melton escorted her to her car.[12] (Doc. 15-1, p.28 (103:21-104:21); Doc. 15-2, pp.24 (83:9-17), 27 (97:3-18).) Phillips got in her car and went to grab her parking badge that had been hanging in the window, and according to her the badge fell apart, and she handed it out the door in pieces, and it ended up on the ground. (Doc. 15-1, pp.28-29 (104:22-106:1).) She denies throwing the badge at O'Neal, but does not dispute that it hit him. (*Id.*; Doc. 16, pp.15-16, ¶ 28.) O'Neal testified that Phillips grabbed the parking decal, and threw it, hitting O'Neal in the chest. (Doc. 15-2, pp.23 (79:7-12), 24 (82:10-83:8).) Melton testified that he remembered the badge breaking as Phillips pulled it off, and that she "flicked it" "like a frisbee throw" and it hit O'Neal in the chest or stomach before it hit the ground. (Doc. 15-4, pp.14 (43:20-44:9), 15 (46:11-48:3), 16 (52:2-53:3), *see also* p.32 (Ex. 1).)

---

[12] O'Neal was trained to have two people walk an employee out of the building. (Doc. 15-2, p. 28 (98:13-99:5); *see also* Doc. 15-4, p.16 (50:7-13) ("That's usually how we did it. If we let somebody go, we try not to walk out by ourselves.")) Melton testified that O'Neal asked him to walk with him and Phillips. (Doc. 15-4, p.13 (40:23-41:13).)

Phillips contacted Legacy's Human Resources office and was informed that her employment was terminated for insubordination. (Doc. 15-1, p.28 (102:14-103:2).) O'Neal fired Phillips "[f]or being insubordinate and disrespectful out on the floor and resulting to name calling. That was enough to bypass the progressive discipline and just – because I didn't want that to spread through the floor the way she was displaying herself and the way she was being disrespectful to a manager." (Doc. 15-2, p.30 (106:2-107:8).) He sent an email to the Human Resources Manager with his description of the events on November 15, 2019. (Doc. 15-2, pp.29 (103:11-14), 57-58 (Ex. 2).)

After Phillips's employment ended, Gloria Ramirez took Phillips's position on the line for some time, and later Hanna assigned a new employee, Shaina Gambles (black female) as the permanent replacement. (Doc. 15-3, p.8 (19:11-20:23).)

## II.    <u>**Phillips's Evidence Regarding Comparators Fails to Infer Intentional Race Discrimination.**</u>

Phillips testified at her deposition that she thought O'Neal singled her out because she was white, and that there was no reason for O'Neal to get mad at her and fire her. (Doc. 15-1, p.24 (86:4-18, 88:12-23).) Phillips further testified that O'Neal "didn't like white people," however this was not based on anything O'Neal said but based on his "actions." (Doc. 15-1, p.24 (86:16-87:2).) Phillips cited two incidents involving white employees. The first was that O'Neal "fired that one

white boy for bringing the wrong frames." (Doc. 15-1, p.24 (86:22-88:1).)  Phillips did not know the name of the employee who brought the wrong frames or any other information except than that she heard he pulled the wrong frames by mistake. (Doc. 15-1, p.24 (87:17-88:1).) The second was that an employee nicknamed "Red" told Phillips's boyfriend that he was not at Legacy anymore because of O'Neal; she does not know what happened. (Doc, 15-1, pp.6-7 (17:12-18:3), 24 (88:2-11).) Neither of these examples included evidence that O'Neal was acting with discriminatory intent, and Phillips did not assert in her summary judgment opposition or in this brief that either incident was such evidence of intent.

In Phillips's opposition to summary judgment and in her Appellant's Brief, she cites as comparator evidence a handful of disciplinary records regarding black employees at Legacy. Legacy produced approximately six hundred pages of disciplinary records from the personnel files of employees who were employed at the same time as O'Neal.  The records are limited in their descriptions of the conduct and therefore cannot be properly compared without further elaboration regarding the underlying conduct or additional context, which is not part of the record. Moreover, Phillips's reliance on a selection of disciplinary records of Black employees is misleading because it fails to limit those records to just those

involving O'Neal, and also fails to acknowledge records of White or Hispanic employees who were also disciplined by O'Neal and others.  (Doc.  15-5.)

There were 34 records of incidents involving 31 employees for which O'Neal was involved as a supervisor, either on his own or with another supervisor, and for which there was no resulting termination. (Doc. 15-5, pp.2-35.) Of those disciplined by O'Neal, 17 were black, 11 were white, and 2 were Hispanic. (Doc. 15-4.) The following is a summary of the demographic information:

| **Name** | **Race** |
|---|---|
| Darren Carmichael (Doc. 15-5, p.2) | Black Male (Doc. 15-5, p.2.) |
| Tameesha Williams (Doc. 15-5, pp.3-4) | Black Female (Doc. 15-5, p.41) |
| Chris Tarwater (Doc. 15-5, p.5) | White Male (Doc. 15-5, p.40) |
| Loretta Smith (Doc. 15-5, p.6) | White Female (Doc. 15-5, p.40) |
| Mildred Snipes (Doc. 15-5, p.7) | White Female (Doc. 15-5, p.40) |
| Charity Price (Doc. 15-5, pp.7, 16) | White Female (Doc. 15-5, p.39) |
| Tavia Slater (Doc. 15-5, pp.8-9) | Black Female (Doc. 15-5, p.40) |
| Henry Sheppard (Doc. 15-5, p.10) | Black Male (Doc. 15-5, p.39) |
| LaKentio Streeter (Doc. 15-5, p.11) | Black Male (Doc. 15-5, p.40) |
| Nikia Sturkie (Doc. 15-5, p.12) | Black Female (Doc. 15-5, p.40) |
| Patrice Swain (Doc. 15-5, p.13) | Black Female (Doc. 15-5, p.40) |
| Aaron Swink (Doc. 15-5, p.14) | White Male (Doc. 15-5, p.40) |
| Kelly Pate (Doc. 15-5, p.15) | White Female (Doc. 15-5, p.39) |
| Maliyah Patton (Doc. 15-5, p.17) | Black Female (Doc. 15-5, p.39) |
| Tyler Prater (Doc. 15-5, p.18) | Black Male (Doc. 15-5, p.39) |
| Maeola Newell (Doc. 15-5, p.19) | Black Female (Doc. 15-5, p.39) |
| Amy Newell (Doc. 15-5, p.20) | White Female (Doc. 15-5, p.39) |
| Mary Morgan (Doc. 15-5, p.21) | Black Female (Doc. 15-5, p.39) |
| Daniel Lucas (Doc. 15-5, p.22) | White Male (Doc. 15-5, p.38) |
| "Caitlyn" (Doc. 15-5, p.22) | Unknown |
| Luke Keith (Doc. 15-5, p.23) | Black Male (Doc. 15-5, p.38) |
| Mike Joiner (Doc. 15-5, p.24) | Black Male (Doc. 15-5, p.38) |
| Jonathan Harris (Doc. 15-5, p.25) | White Male (Doc. 15-5, p.37) |
| Griselda Haros (Doc. 15-5, p.26) | Hispanic Female (Doc. 15-5, p.37) |

19

| Name | Race |
|------|------|
| Gordon Garratt (Doc. 15-5, p.27) | Black Male (Doc. 15-5, p.37) |
| Leslie Gregory (Doc. 15-5, p.28) | White Female (Doc. 15-5, p.37) |
| Kathy Groce (Doc. 15-5, p.29) | Black Female (Doc. 15-5, p.37) |
| Kimberly Fuentes (Doc. 15-5, pp.30-31) | Hispanic Female (Doc. 15-5, p.37) |
| Tara Bush (Doc. 15-5, pp.32-33) | Black Female (Doc. 15-5, p.36) |
| Stephanie Cholowenski (Doc. 15-5, p.34) | White Female (Doc. 15-5, p.36) |
| Jaquea Davis (Doc. 15-5, p.35) | Black Female (Doc. 15-5, p.36) |

The only black employees listed on Phillips's chart (Appellant's Corrected Br. at 35-36) and the chart above whose conduct involved O'Neal are Stockdale and Craig from the initial incident in the huddle on the day of Phillips's termination, Tameesha Williams, Kathy Groce, and Tavia Slater.[13]

Regarding Slater, the documentation reflects that O'Neal spoke with her because she threatened to leave work early if a fan was not turned on in the paint room. (Doc. 17-4, p.5.)

> I also explained to her going forward if someone from management is trying to assist you, don't say you are going home if something don't get done. Telling someone you are going home if they don't do something will cause you to not be employed here at Legacy. I think she understood the conversation well. She returned to the paint line and the lead person will attempt to get her fan turned around.

(*Id.*) O'Neal informed Ms. Slater that her comment was unacceptable and that saying this again could result in her termination, and unlike Phillips there was no

---

[13] The other records do not provide any detail regarding the unacceptable conduct such that there can be an adequate comparison made. And none of the records include the level of persistence demonstrated by Phillips in continuing to make disrespectful and/or inappropriate comments after several instructions to stop.

20

indication that she continued to engage in disrespectful or insubordinate conduct or make disrespectful comments towards a supervisor. (*Id*.)

The disciplinary record regarding Tameesha Williams (black female) references her negative attitude, gossiping, and instigating bad working relationships on the floor, but does not state what language Ms. Williams used or that it was directed towards a supervisor, and there was no indication that she used any profanity. (Doc. 17-4, p.2.) When O'Neal spoke to her and told her that this behavior would not be tolerated, she said that "she understood, and did not deny any of the statements." (*Id*.) The record states that she "began to comment" after the meeting, but it does not state what the comment was, so there was no indication that it was disrespectful or insubordinate, and the interaction ended with Ms. Williams returning to work. (*Id*.)

Regarding Kathy Groce (black female), the disciplinary record references her use of profanity towards her supervisor but does not identify the supervisor that was the target of the profanity, nor does the record describe what the profanity was. (Doc. 17-4, p.12.) The record also does not indicate that Ms. Groce continued to act inappropriately despite being asked not to, unlike Phillips. (*Id*.)

Phillips also fails to consider the other records of O'Neal's discipline of Black, White and Hispanic employees. The records show that there were white employees that were insubordinate or presented a bad attitude that were not

21

terminated by O'Neal. Chris Tarwater was asked to put his safety glasses on and he failed to do so; O'Neal met with him in HR and told him his behavior was unacceptable and would not be tolerated. (Doc. 15-5, p.5.) Kelly Pate "got an attitude with Derrick and told him that's not her job. Derrick brought her to the office to explain that he wasn't going to put up with a bad attitude." (Doc. 15-5, p.15.) And Jonathan Harris received a write-up for "not following instructions" for reporting information. (Doc. 15-5, p.25.) None of these employees were terminated for their conduct. There are also a number of disciplinary records which involved O'Neal of white, black, and Hispanic employees for attendance issues. (Doc. 15-5.)

Finally, Phillips's EEOC charge also included a complaint of age discrimination, which was not alleged in her federal court complaint. She believes that she was discriminated against on the basis of her age. (Doc. 15-1, pp. 9-10 (29:16-30:1), 10-11 (33:16-34:1).) She testified that she "was older than most of the people on the line," that she "felt they wanted younger people on the line," and that she "just felt like O'Neal didn't like it because I was older." (Doc. 15-1, p.10 (30:2-11, 32:22-33:4).) However, Phillips has not pursued this alternate theory of discrimination in this case.

## (iii) STATEMENT OF THE STANDARD OF REVIEW

Review of the district court's grant of summary judgment is *de novo*. *Peppers v. Cobb County, Ga.*, 835 F.3d 1289, 1295 (11th Cir. 2016). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Once the movant submits a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show that specific facts exist that raise a genuine issue for trial. If the nonmoving party presents evidence that is merely colorable or not significantly probative, summary judgment is appropriate." *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017) (quotations and internal citations omitted).

## SUMMARY OF THE ARGUMENT

Phillips contends that the District Court was correct in finding that she met her prima facie burden, and that a jury could infer that the reason for her termination was false. Legacy contends that the District Court should have found that Phillips failed to establish a prima case of discrimination on the basis that she failed to establish a proper comparator, and that the District Court should not have acknowledged that the nondiscriminatory reason for her termination could be pretextual, solely based on Phillips's subjective denials of *some* of her statements leading to her termination.

23

Regarding the events leading to her termination, the District Court should not have endorsed Phillips's general denials that she was disrespectful, irate, insubordinate, that she did not interrupt O'Neal, and that she did not comment that O'Neal was stupid. Phillips does not dispute that she spoke at the huddle for one or two minutes, kept saying to O'Neal that it was illegal to work on Sundays, and told him after the huddle that he did not know how to talk to people or how to treat people, and that he could have the gift card back that he awarded her. So, although Phillips denies O'Neal and others' characterization of her behavior and some of the details of what she said, Phillips cannot demonstrate that O'Neal's reasons, the culmination of multiple instances of disrespectful conduct, were "not believable." *Jackson v. State of Ala. St. Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994)).

Regardless, the District Court was correct in determining that Phillips's only evidence of discrimination, that of purported comparators, was not sufficient to infer intentional race discrimination. Even if the Court were to more explicitly consider the two comparators who were at the huddle before Phillips was suspended and later terminated, that plus the limited record that Phillips presented of other disciplinary records is not sufficient to establish evidence of discrimination. The disciplinary records do not provide sufficient detail of the underlying conduct to determine whether it was sufficiently similar to Phillips's

24

conduct. And there is no indication in the records that, when the employee was directed to stop engaging in such conduct, that the employee instead continued to engage in disrespectful conduct like Phillips did. Likewise, Craig and Stockdale did not persist in interrupting and disrupting the huddle in the same manner as Phillips and were not taken to the office like Phillips before she made further comments and was then terminated.

Finally, given the number of employees for which there are records of O'Neal being involved in their discipline that did not result in a termination, and of diverse race, as well as undisputed testimony in this case that O'Neal was a difficult manager, this evidence does not demonstrate that O'Neal was acting with discriminatory intent or present evidence of "systematically better treatment of similarly situated employees," to support pretext. *Lewis v. City of Union City, Ga.*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*") (citation omitted).

To sum up, Phillips failed to establish through comparator evidence an inference of discriminatory intent. Absent other evidence of discrimination, Phillips cannot meet her burden of showing that discrimination was the reason for her termination. *Worley v. City of Lilburn*, 408 F. App'x 248, 251 (11th Cir. 2011) ("[a] legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible . . . discrimination.").

25

Additionally, under any other theory of discrimination, including mixed-motive, Phillips lacks the requisite evidence of discriminatory intent for summary judgment to have been denied. The record in this case does not support an inference that O'Neal acted with discriminatory intent because the only evidence – that of flawed comparators – is not sufficient.

## **ARGUMENT**

Phillips alleged a Title VII and a § 1981 race discrimination claim. The elements of the claims are the same, except that for the § 1981 claim, Phillips bears the burden of showing that race was a but-for cause of the discrimination, not merely a motivating factor. *Comcast Corp. v. Nat'l Ass'n of African-Am.-Owned Media*, 589 U.S. __, 140 S. Ct. 1009, 1014 (2020).

Phillips has no direct evidence of race discrimination, and so she can only maintain a case of discrimination on the basis of circumstantial evidence. One way that she can create a jury question on her discrimination claims is to satisfy the three-part burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800-06 (1973).

> Step 1: Under *McDonnell Douglas*, [Phillips] bears the initial burden of showing "(1) that [she] belongs to a protected class, (2) that [she] was subjected to an adverse employment action, (3) that [she] was qualified to perform the job in question, and (4) that [her] employer treated 'similarly situated' employees outside [her] class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc).

26

<u>Step 2</u>: If [Phillips] makes out a prima facie case of discrimination, the burden then shifts to [Legacy] to articulate a legitimate, nondiscriminatory reason for its actions. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

<u>Step 3</u>: Should [Legacy] carry its burden, the burden then returns to [Phillips] to establish that [Legacy]'s proffered reason for its actions was merely a pretext for unlawful discrimination, an obligation that "merges with [her] ultimate burden of persuading the [factfinder] that [she] has been the victim of intentional discrimination." *Id.* at 256.

*Skelton v. Birmingham Airport Auth.*, No. 2:18-CV-01240-CLM, 2020 WL 5632973, at *4 (N.D. Ala. Sept. 21, 2020), *aff'd*, No. 20-13982, 2021 WL 4476800 (11th Cir. Sept. 30, 2021).

But "the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Thus, Phillips may also survive summary judgment if she shows "a convincing mosaic of circumstantial evidence" of intentional discrimination, however she did not assert this theory to the District Court or to this Court. *Id.* Further, Phillips can survive summary judgment under a mixed-motive theory of discrimination by offering "evidence sufficient to convince a jury" that: (1) Legacy took an adverse employment action against her; and (2) a protected characteristic was a motivating factor for Legacy's adverse employment action. *See Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016).

Phillips asserts that under either the *McDonnell Douglas* standard or the mixed-motive standard, her claims survive summary judgment because she has created an issue of fact regarding the facts surrounding O'Neal's decision to terminate her employment, and because she has sufficient evidence of comparators to suggest intentional discrimination.  Legacy asserts that Phillips's claims do not survive summary judgment because, despite the District Court's decision to contrary, she did not create an issue of fact as to whether the reason for her termination was false. Moreover, the District Court was correct that the evidence of comparators failed to infer intentional race discrimination by O'Neal, even when taking into account what happened on the day of the termination involving Craig and Stockdale.  Finally, Legacy asserts that this case is not a mixed-motive case, but even if it was, Phillips lacks the same evidence of discriminatory intent required to survive summary judgment.

## I.    <u>Phillips Failed to Establish a Prima Facie Case</u>.

Legacy does not dispute that Phillips (1) is a member of a protected class, (2) was qualified for her position, and (3) suffered an adverse employment action. Regarding the fourth requirement, whether Phillips can show that she "was replaced by someone outside of her protected class or was treated less favorably than a similarly situated employee outside of her class," *Abram v. Von Maur, Inc.*, 719 F. App'x 929, 931 (11th Cir. 2018), although Legacy does not dispute that

Phillips was eventually replaced by a non-white employee outside of her protected class, it was not immediate and the decision was made by a different decisionmaker, Hanna, rather than O'Neal.

Regardless, Phillips cannot present a similarly situated employee who was treated more favorably. Ordinarily, a similarly situated comparator will have "engaged in the same basic conduct . . .; will have been subject to the same employment policy, guideline, or rule . . .; will . . . have been under the jurisdiction of the same supervisor . . .; and will [have] shared [similar] employment or disciplinary histories." *Lewis v. City of Union City*, 918 F.3d 1213, 1227-28 (11th Cir. 2019) (en banc) ("*Lewis I*"). Here, there is no evidence that a similarly-situated comparator engaged in the same basic conduct. Phillips cites Craig and Stockdale as comparator employees who complained about having to work the following day, but neither of them continued to interrupt O'Neal as he was speaking to the group. Moreover, Phillips was not terminated from employment until after she was taken to the office and suspended and then continued to make disrespectful and insubordinate comments towards O'Neal. Neither Craig nor Stockdale made such disrespectful comments, and neither of them continued to do so in the same manner as Phillips, who continued to insult O'Neal despite several admonitions not to.  Such differences in conduct do not establish an adequate comparator. *Hill v. Houchens Food Group, Inc.*, No. 1:19-cv-103-KD-C, 2020 WL

29

2750366, at *10 (S.D. Ala. May 27, 2020) ("Even if the Court assumes the 'attitudes,' 'fussing' and 'got into i[t]' meant these individuals raised their voices at managers, these individuals' conduct was not the same misconduct as [Plaintiff]'s. [Plaintiff] does not allege or present evidence that these individuals refused a work instruction from a manager, as she is accused to have done.")

Regarding the records of other disciplinary actions by O'Neal and others, those fail to demonstrate that there was a similarly-situated non-white employee that engaged in the same, highly-unique conduct as Phillips, and was treated more favorably. To the contrary, O'Neal's disciplinary actions demonstrate that he took action against black, white, and Hispanic employees.  Therefore, the District Court could have and should have found that Phillips did not establish a prima facie case on the basis of her comparator evidence.

## II.    Legacy Had Non-Discriminatory Reasons for Terminating Phillips's Employment and There is no Evidence of Pretext.

Even if Phillips prevailed on her prima facie case, Legacy had legitimate, non-discriminatory reasons for terminating her employment, and the District Court correctly found that Phillips failed to present sufficient evidence of discriminatory intent.

If "a plaintiff successfully establishes a *prima facie* case of discriminatory discharge, the burden then shifts to the employer to proffer a legitimate, non-discriminatory reason for its employment decision against the plaintiff." *Tebo v.*

*City of DeBary, Fla.*, 784 F. App'x 727, 730 (11th Cir. 2019) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). The Eleventh Circuit has described this burden as "exceedingly light." *Conner v. Fort Gordon Bus Co.*, 761 F.2d 1495, 1499 (11th Cir. 1985) (*quoting Perryman v. Johnson Prods. Co.,* 698 F.2d 1138, 1142 (11th Cir. 1983)). The District Court directly determined that Legacy met its burden of producing a nondiscriminatory reason because Legacy terminated Phillips's employment for insubordination. (Doc. 29, p.12.)

If the employer provides a legitimate, non-discriminatory reason for the decision, the burden then shifts back to the plaintiff to produce evidence that the proffered reason was pretextual, "and that discrimination was the real reason." *Matthews v. City of Mobile*, No. 14-cv-601-KD-N, 2016 WL 1736061, at *11 (S.D. Ala. May 2, 2016), *aff'd sub nom. Matthews v. City of Mobile, Ala.*, 702 F. App'x 960 (11th Cir. 2017) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Mere contradiction of the legitimate, nondiscriminatory reasons alone does not create or support an inference of discriminatory action. *Flowers v. Troup Cty., Ga., Sch. Dist.*, 803 F.3d 1327, 1339 (11th Cir. 2015), *cert. denied Flowers v. Troup Cty., Ga., Sch. Dist.*, 136 S. Ct. 2510 (2016).

To show pretext, Phillips must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find

them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks omitted). Put differently, the plaintiff must put forth evidence from which a reasonable factfinder could conclude the reasons are "not believable." *Jackson*, 405 F.3d at 1289 (quoting *Howard*, 32 F.3d at 526).

Moreover, "if the proffered reason is one that might [have] motivate[d] a reasonable employer," then Phillips "must meet that [proffered] reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (plaintiff "not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.")

O'Neal terminated Phillips because she was being insubordinate and disrespectful. After several opportunities for Phillips to stop speaking disrespectfully, O'Neal determined that she crossed the line. (Doc. 15-2, pp.22-23 (76:8-78:22), 29 (103:19-104:20).) O'Neal thought Phillips had been a good employee in the weeks prior and had even awarded her a gift card that week for her efforts. (Doc. 15-1, p.16 (57:1-5); Doc. 15-2, pp.17 (56:4-5), 19 (63:1-6).) But his decision was prompted by Phillips's disrespectful and inappropriate conduct on the day she was terminated and not by any discriminatory intent.

Phillips denies that her actions justified her termination and disputes O'Neal's account of what led to her termination. But "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atlantic Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010) (citation omitted).

> "[W]e must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees." *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002); *cf. Wilson* [*v. B/E Aerospace, Inc.*], 376 F.3d [1079], 1092 [(11th Cir. 2004)] ("Whether [plaintiff's] conduct was insubordinate is not an issue for this Court to referee.") The question to be resolved is not the wisdom or accuracy of [defendant's] conclusion . . ., or whether the decision to fire her was "prudent or fair." *See Rojas*, 285 F.3d at 1342. Instead, "our sole concern is whether unlawful discriminatory animus motivate[d]" the decision. *Id*. (quotation marks and citation omitted).
>
> ***
>
> Title VII does not require the employer's needs and expectations to be objectively reasonable; it simply prohibits the employer from discriminating on the basis of membership in a protected class. We do not sit as a "super-personnel department," and it is not our role to second-guess the wisdom of an employer's business decisions— indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive. *Chapman*, 229 F.3d at 1030.

*Id*. Moreover, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not

33

for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communication*, 738 F.2d 1181, 1187 (11th Cir. 1984), *abrogated in part on other grounds by Lewis I*, 918 F.3d 1213.

Here, Phillips may dispute some of what she said, but she cannot demonstrate that O'Neal's reasons to terminate her were false or that O'Neal's subjective response to the comments that she made to him was false. Phillips does not dispute that she spoke in the huddle for one to two minutes, that she kept saying to O'Neal that it was illegal to work on Sundays, and that he did not know how to talk to people or how to treat people. Nor does she dispute that just before her termination, she told O'Neal that he could have her gift card back. So, although Phillips denies O'Neal and others' characterization of her behavior and some of the details of what she said, Phillips cannot demonstrate that O'Neal's reasons, the culmination of multiple instances of disrespectful conduct, were "not believable." *Jackson*, 405 F.3d at 1289 (citation omitted); *see also Wesley v. Austal USA, LLC*, 776 F. App'x 638, 644 (11th Cir. 2019) ("Even if evidence suggests that a proffered reason is a 'pretext of *something*,' summary judgment is appropriate if the plaintiff's evidence does not support an inference that the reason was a pretext for racial discrimination.") (quoting *Flowers v. Troup Cty., Ga. Sch. Dist.*, 803 F.3d 1327, 1337-38 (11th Cir. 2015)) (emphasis in the original).

O'Neal fired Phillips because she was being insubordinate and disrespectful. After providing Phillips several opportunities to stop speaking disrespectfully, before and after he suspended her for the remainder of the weekend, he took further action by terminating her employment, and there is no evidence that this was prompted by anything other than her actions. Phillips's attempt to rebut these reasons by "parsing the details of selected incidents, generally disputing her supervisor['s] assessments, and providing her own contrary appraisal of her [behavior], is unavailing . . . . [T]his evidence does not raise an issue of fact regarding the overall legitimacy of the proffered explanation." *Taylor v. Polygram Records*, No. 94 CIV.7689(CSH), 1999 WL 124456, at *10 (S.D.N.Y. March 8, 1999). "In sum, [Phillips] has failed to produce any evidence, outside of her own conclusory say-so, that would support an inference of discrimination from the circumstances, and the Eleventh Circuit has repeatedly and emphatically held that employers may terminate an employee for a good or bad reason without violating federal law." *Hayes v. Deluxe Mfg. Ops. LLC*, No.1:16-cv-2056-RWS-RGV, 2018 WL 1461690, at *25 (N.D. Ga. Jan. 9, 2018) (cleaned up).

## III.  **Phillips Has No Evidence of Discriminatory Intent.**

Phillips has no other evidence to suggest that O'Neal's decision to terminate her was made based on her race. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 515 ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is

shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphasis in original). The only proposed evidence that Phillips presented of race discrimination was her comparator evidence, and that record evidence is not sufficient.

Phillips focuses on the incident on the floor during the huddle in order to use Craig and Stockdale as comparators, and as discussed below, that evidence alone from the prima facie stage or in combination with the other comparator evidence should not be sufficient on its own to establish pretext. But even so, the events that resulted in Phillips's termination occurred after Craig and Stockdale's comments in the huddle and under different circumstances. Phillips was not terminated from employment until after she was taken to the office by O'Neal and Hanna, suspended, and then continued to make disrespectful and insubordinate comments towards O'Neal. Neither Craig nor Stockdale made such disrespectful comments, and neither of them continued to do so in this different location in the same manner as Phillips, who continued to be rude to O'Neal despite several admonitions not to. Again, such differences in conduct do not establish an adequate comparator, and what happened to Phillips is not comparable to those employees who protested during the huddle.

Moreover, the other comparator evidence presented does not further Phillips's argument that she could establish evidence of discriminatory intent.

Many of those records did not even involve O'Neal as the supervisor involved, and only three employees' disciplinary records described some conduct which is comparable (Williams, Groce, and Slater), but does not rise to the level of a *comparator*. The disciplinary record regarding Williams references a comment that she made, but it does not state what the comment was or whether it was disrespectful or insubordinate. (Doc. 17-4, p.2.) And when O'Neal spoke to Williams, she said that "she understood, and did not deny any of the statements." (*Id*.) Regarding Groce, the disciplinary record does not identify the name of the supervisor that was the target of the profanity, nor does the record describe what the profanity was. (Doc. 17-4, p.12.) The record also does not indicate that Groce continued to act inappropriately despite being asked not to, unlike Phillips. (*Id*.) And Slater was coached by O'Neal because she made a comment that she would leave work early if a fan was not turned on the paint room, and O'Neal remarked that he thought Slater "understood the conversation well." (Doc. 17-4, p.5.) O'Neal never had such an understanding or acquiescence from Phillips.

Moreover, as set forth above and relied upon by the District Court, there are a number of employees who O'Neal disciplined that were of diverse race. (Doc. 19, pp.11-12.) This included white employees such as Tarwater, Pate, and Harris, who were not terminated, even though they engaged in conduct including having a bad attitude and not following instructions. (*Id*.) This evidence, in addition to

evidence that O'Neal was a difficult manager (Doc. 16, pp.6-7), does not demonstrate that O'Neal was acting with discriminatory intent or present evidence of "systematically better treatment of similarly situated employees." *Lewis II*, 934 F.3d at 1185 (citation omitted); *Brown v. Jefferson County Sheriff's Dep't*, 806 F. App'x 698, 703 (11th Cir. 2020) (comparative conduct towards employees outside of plaintiff's protected class diminished probative value of plaintiff's comparator evidence).

To the contrary, Phillips and Hanna testified that O'Neal was a difficult manager with everyone. "It would be paradoxical to permit a plaintiff to prevail on a claim of discrimination based on indiscriminate conduct." *Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301 n.1 (11th Cir. 2007) (calling this principle the "Vince Lombardi Rule" because the great coach treated all of his players poorly, such that no one could accuse him of discrimination).

In the end, "Title VII . . . do[es] not turn personal disagreements or feuds into impermissible discrimination." *Sanders v. Mercedes-Benz U.S. Int'l, Inc*., No. 7:17-CV-01253-LSC, 2019 WL 330145, at *4 (N.D. Ala. Jan. 25, 2019). And "[w]hether [an employee's conduct] was insubordinate is not an issue for this Court to referee." *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086–87 (11th Cir. 2004), *abrogated on other grounds by Lewis I*. Absent evidence of intentional race discrimination, Phillips's discrimination claims should not proceed to trial.

As an additional matter, Phillips's theory of race discrimination is also undermined by her simultaneous belief, albeit without evidence, that she was also discriminated against on the basis of her age. At the very least, Phillips does not have a viable claim under § 1981 of but-for causation based on race discrimination because she also contends that age discrimination was the cause of her termination. *Comcast Corp.*, 149 S. Ct. at 1014.

O'Neal decided to terminate Phillips's employment after she repeatedly failed to stop speaking disrespectfully to him, and there is no evidence that the basis for his decision was false or that he was motivated by her race. As a result, the District Court correctly found that Phillips cannot create a triable issue of fact that Legacy engaged in race discrimination.

## IV.  **Phillips Should Not Survive Summary Judgment Solely Based on Her Prima Facie Case.**

Phillips argues that her comparator evidence regarding Craig and Stockdale which the District Court found to establish her prima facie case should similarly establish an inference that discrimination was the reason for her termination, whether on its own or in combination with the other comparator evidence she presented.  Although "[e]vidence necessary and proper to support a plaintiff's *prima facie* case, may . . . be used . . .  to demonstrate that the defendant's explanation for its conduct was pretextual." *Lewis I*, 918 F.3d at 1223 n.9, the evidence establishing plaintiff's prima facie case does not maintain its conclusory

force at the pretext stage. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142-43 (2000) (noting that after a defendant establishes a legitimate, nondiscriminatory reason for its action, the *McDonnell Douglas* framework with its presumptions and burdens disappears and the sole remaining issue becomes discrimination *vel non*) (cleaned up). In other words, a prima facie case does not, on its own, establish pretext.

Instead, the evidence from the plaintiff's prima facie case must "reasonably support an inference of discrimination." *Willis v. Koch Agronomic Servs*., LLC, 846 F. App'x 787, 797 n.11 (11th Cir. 2021).

> At one time under this Circuit's law, [a plaintiff] could have gotten [her] claims before a jury after making a prima facie case and merely contradicting the [defendant]'s proffered legitimate, nondiscriminatory reason . . . . Intervening precedent has since closed this avenue for Title VII plaintiffs. . . . The burden placed on Title VII plaintiffs to produce *additional* evidence suggesting discrimination after contradicting their employer's stated reasons is not great, but neither is it nothing.

*Flowers*, 803 F.3d at 1339 (emphasis added); *see Brown*, 806 F. App'x at 703 (comparator evidence showing a "single and aberrant instance of differential treatment" not probative enough to avoid summary judgment); *Jackson v. City of Killeen*, 654 F.2d 1181, 1186 (5th Cir. 1981) (plaintiff's mere restatement of evidence from prima facie case insufficient to show pretext); *Muniz v. Dynamic Sys., Inc*., No. CV 117-074, 2019 WL 4439816, at *9 (S.D. Ga. Sept. 16, 2019) ("a plaintiff is not permitted to rest on [her] prima facie case laurels at the pretext

stage"); *Luke v. Univ. Health Servs., Inc.*, No. CV 117-125, 2019 WL 4670757, at *9 (S.D. Ga. Sept. 24, 2019), *aff'd*, 842 F. App'x 503 (11th Cir. 2021) (same).

Accordingly, courts have continued to recognize that a prima facie case establishing "similarly situated comparators" is not always sufficient to show pretext and survive summary judgment. *See Siddiqui v. NetJets Aviation, Inc.*, 773 F. App'x 562, 565 (11th Cir. 2019) ("[Plaintiff] does not point to any evidence in the record, apart from his proffered comparators, that would support an inference that the real reason for either the initial investigation or the ensuing delay was discrimination on the basis of his race, religion, or national origin"); *Brown*, 806 F. App'x at 703; *Nix*, 738 F.2d at 1187 ("The differential treatment of [Plaintiff and a comparator] is not enough, by itself, to support judgment for [Plaintiff]).

Here, as set forth above, Phillips's only evidence of discriminatory intent is O'Neal's treatment of supposed comparative employees. Although Phillips claims that Craig and Stockdale were treated differently at the huddle, she cannot dispute that their paths diverged when she was taken back to the office, suspended, and *then* terminated. Such a difference removes those employees' misconduct from being proper comparators, whether the court is reviewing those employees at the prima facie stage or at the pretext stage, but certainly at the pretext stage when the burden is on the plaintiff to produce evidence from which a jury could infer race discrimination. And the other evidence of comparators is even further attenuated

from the circumstances that resulted in Phillips's termination, and therefore does not rise to the level of substantial evidence of discriminatory intent. *Lee v. Safe-Dry Carpet & Upholstery*, No. 20-14275, 2021 WL 3829028, at *4-5 (11th Cir. Aug. 27, 2021) (affirming summary judgment and finding that the plaintiff's purported comparators did not support an inference of discrimination) (citing and discussing *Flowers* for the proposition that the comparator's alleged conduct must be "nearly identical to the plaintiffs' to support evidence of pretext).

## V.    Phillips Cannot Assert a Mixed-Motive Theory, But Even So, She Lacks Evidence of Discriminatory Intent to Overcome Summary Judgment.

Finally, it was not reversible error for the District Court to decline to engage in a mixed-motive-specific analysis in this case. By finding that Phillips failed to produce sufficient evidence of discriminatory intent, the District Court correctly foreclosed Phillips's mixed-motive theory.

### A.    Legacy moved for summary judgment as to the mixed-motive theory.

As an initial matter, Phillips argues that Legacy failed to move for summary judgment on the mixed-motive theory. However, Legacy moved for summary judgment on all claims, under any theory of discrimination. (Doc. 16, pp.1-2 ("Phillips cannot establish that the reason for her termination was pretextual, nor can she establish discrimination through any other method of proof.")) As Phillips acknowledged, Legacy's brief referenced the mixed motive standard. (Appellant's

Corrected Br. at 55 ("Phillips can survive summary judgment under a mixed-motive theory of discrimination by offering 'evidence sufficient to convince a jury' that (1) Legacy took an adverse action against her; and (2) a protected characteristic was a motivating factor for Legacy's adverse employment action.")) And Legacy argued in part III of its summary judgment brief that Phillips has no evidence of discriminatory intent, which is dispositive of Phillips's discrimination claims under any theory. (Doc. 16, pp.25-27; *see also* Legacy's Reply Brief, Doc. 19, pp.15-17 ("Phillips fails to establish through comparator evidence an inference of discriminatory intent."))

In *Burton v. Gwinnett County School District*, No. 1:16-cv-03775-LMM-WEJ, 2018 WL 10398907, at *1 (N.D. Ga. Feb. 7, 2018), the court addressed a similar argument, in which the Defendant moved for summary judgment as to all claims, but did not address mixed motive in the principal brief at all (unlike Legacy). The court found that "its arguments for why summary judgment should be granted on a single motive theory included the same reason for why a mixed motive theory could not prevail: Plaintiff could not show that race was a motivating factor in her termination." *Id*. Moreover, in the instant case this issue has now been fully briefed, and "so long as the party against whom judgment will be entered . . . has been afforded an adequate opportunity to demonstrate why summary judgment should not be granted, then granting summary judgment *sua*

43

*sponte* is entirely appropriate." *Id*; *quoting Burton v. City of Belle Glade*, 178 F.3d 1175, 1204 (11th Cir. 1999). Here, the parties have been afforded an adequate opportunity to brief these issues and the District Court, as well as this Court on *de novo* review, may find that summary judgment was properly granted. *Burton*, 178 F.3d at 1204; *see also Burton*, 2018 WL 10398907, at *1 ("In any event, the Court notes that the Magistrate Judge had the authority to enter summary judgment against the Plaintiff *sua sponte*.") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, as long as the losing party was on notice that she had to come forward with all of her evidence.")).

### B.    <u>Phillips does not factually establish a mixed-motive theory.</u>

Plaintiff asserts that "this is a mixed motive case" (Appellant's Corrected Br. at 56) but that is based on her pleadings and summary judgment legal arguments alone; Plaintiff has always disputed that she engaged in behavior that warranted her termination and has consistently asserted that the reason for her termination was pretextual and false. (*See, e.g.* Doc. 18, p.27-29 ("Plaintiff disputes that this conduct occurred."))[14]

"Where an employee puts forth only circumstantial evidence in support of her discrimination claims, the *McDonnell Douglas* framework generally applies."

---

[14] Legacy reserves the right to raise the mixed-motive theory at trial, if this case proceeds.

*Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 130 (11th Cir. 2019) (quoting *Benjamin v. SNF Holding Co.*, 602 F. App'x 758, 762 (11th Cir. 2015) (internal quotations omitted)). And "[i]f . . . the plaintiff argues that the unlawful bias was the true reason for h[er] termination, the plaintiff is presenting a single-motive theory." *Jones v. Unity Behavior Health, LLC*, No. 9:19-cv-81341-ROSENBERG, 2020 WL 6731679, at *7 (S.D. Fla. Oct. 13, 2020) (citation omitted). "[A] single-motive case is not transformed into a mixed-motive case merely because the employer raises a legitimate, non-discriminatory reason for its actions. [Otherwise], every case would be a mixed-motive case, and the *McDonnell Douglas* framework would be irrelevant." *Smith*, 791 F. App'x at 131; *see also Vaughn v. Sizemore, Inc.*, No. 5:17-cv-1528-LCB, 2019 WL 5963615, at *18 (N.D. Ala. Nov. 13, 2019) ("Plaintiff does not acknowledge that Sizemore also had a legitimate basis upon which to terminate her employment. Therefore, the Court does not analyze Plaintiff's claim under the 'convincing mosaic of circumstantial evidence' or the mixed-motive framework set forth in *Quigg*.") (citation omitted).

For example, in *Little v. Star Asia International, Inc.*, No. 1:20-cv-397-WMR-JKL, 2021 WL 4815897, at *13 (N.D. Ga. Mar. 10, 2021), the district court found that because plaintiff was arguing that, if not for his supervisor's animus, he would not have been fired, "despite invoking a mixed-motive theory of

discrimination, Plaintiff is, in fact, pursuing a single-motive theory of discrimination – *i.e.*, that the true reason for his firing was his race or gender and that the employer's stated reasons for terminating his employment were pretext for discrimination." Similarly here, Phillips has maintained the position that she should not have been terminated from her employment, and that she was singled out because of her race. (Doc. 15-1, p.24 (86:4-18, 88:12-23).)  In a similar manner in *Fonte v. Lee Memorial Health System*, No. 2:19-cv-54-FtM-38NPM, 2020 WL 4596872, at *3 (M.D. Fla. Aug. 11, 2020), the plaintiff "neither alleged nor argued she was terminated for legitimate and illegitimate reasons," and instead argued pretext. And in *Stevenson v. City of Sunrise*, No. 20-12530, 2021 WL 4806722, at *5-6 (11th Cir. Oct. 15, 2021), this Court recently refused to apply a mixed-motive framework because the plaintiff never alleged a legitimate reason for the employer's actions. "A single-motive case is not transformed into a mixed-motive case merely because an employer satisfies its burden of proof." *Id*. at *7. (Rejecting argument that the district court should evaluate her claims under the mixed-motive standard, and remarking that if this argument was accepted, it "would turn *every* Title VII discrimination claim into a mixed-motive case") (emphasis in original).

Therefore, although Phillips states that this is a mixed-motive case and should be analyzed as such, her testimony and arguments regarding pretext run

46

contrary to that position. As a result, this case may be analyzed solely under the *McDonnell Douglas* circumstantial evidence framework.

### C.    **Even under a mixed-motive theory, Phillips's comparator evidence does not infer discrimination.**

To succeed under a mixed-motive theory of liability, a plaintiff must show "that illegal bias, such as bias based on [race], 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Quigg*, 814 F.3d at 1235 (quoting 42 U.S.C. § 2000e-2(m)). This can be accomplished by presenting either direct or circumstantial evidence of discrimination. *See id.* (Citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–102 (2003)).[15] "To avoid summary judgment, a plaintiff raising a mixed-motive claim must offer 'evidence sufficient to convince a jury that: (1) the [employer] took an adverse employment action against [her]; and (2) a protected characteristic was *a* motivating factor for the [employer's] adverse employment action.'" *Bowen v. Manheim Remarketing, Inc.*, 882 F.3d 1358, 1364 (11th Cir. 2018) (quoting *Quigg*, 814 F.3d at 1239). Legacy does not dispute that it took an adverse employment action against Phillips. Therefore, "the court must determine whether the 'plaintiff has presented sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [her protected characteristic] was a motivating

---

[15] Here, there is no direct evidence of discrimination.

factor for [an] adverse employment decision.'" *Quigg*, 814 F.3d at 1239 (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008)).

The only possible evidence of discrimination that Phillips cites in support of her argument that race was a motivating factor was O'Neal's allegedly more favorable treatment of other black employees. (Doc. 18, pp.36-37 ("based on Defendant's more favorable treatment of the African-American comparators discussed above, even if the jury accepts that Plaintiff committed the misconduct Defendant cites as its reason for terminating her, a reasonable jury could still find that Plaintiff's race remained a motivating factor. . . .") There is no direct evidence of discrimination, nor any comments or remarks inferring discrimination or racial animus by O'Neal as a motivating factor, like there were in *Quigg* in which the decisionmakers made multiple comments regarding gender in relation to the employment decision at issue. *Quigg*, 814 F.3d at 1241-42 (statements by three board members that they preferred to hire a man or someone with masculine characteristics for the position during conversations about whether to renew Quigg's contract were circumstantial evidence of discrimination).

Here, as discussed above, the comparator evidence falls short of inferring that Phillips's race was a motivating factor for the employment action. When comparing a plaintiff's treatment to a non-protected employee, "the plaintiff and the employee [s]he identifies with must be 'similarly situated in all material

48

respects.'" *Okwan v. Emory Healthcare Inc.*, No. 20-11467, 2021 WL 4099236, at *6 (11th Cir. Sept. 9, 2021) (quoting *Lewis I*, 918 F.3d at 1238-39 (applying *Lewis* to mixed-motive analysis)); *Burrell v. United Parcel Serv., Inc.,* No. 7:19-CV-01704-LSC, 2021 WL 4894607, at *6 (N.D. Ala. Oct. 20, 2021) (same) ("[W]hether white employees were treated more favorably is not the correct inquiry for this Court. Instead, this Court must determine whether similarly situated comparators, who engaged in similar conduct, were treated different from [the plaintiff]. As previously mentioned, this Court concludes that no similarly situated employees were treated differently than [the plaintiff].") Here, Phillips does not have a demonstrated record of similarly situated comparators such that a jury could infer that her race was a motivating factor for O'Neal's decision to terminate her employment.

Under any theory, Phillips cannot meet her burden of showing unlawful intentional race discrimination and summary judgment is appropriate.

## **CONCLUSION**

Phillips failed to present substantial evidence of race discrimination to overcome summary judgment. Therefore, the District Court's decision should be AFFIRMED.

Respectfully submitted,


*/s/ Christine Harding Hart*
MARK T. WAGGONER
CHRISTINE HARDING HART
HAND ARENDALL
HARRISON SALE LLC

1801 5th Ave. North, Suite 400
Birmingham, AL 35203
(205) 324-4400
(205) 322-1163 Facsimile
mwaggoner@handfirm.com

Post Office Box 123
Mobile, Alabama 36601
(251) 432-5511
chart@handfirm.com

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

I also certify that this brief complies with the type-volume limit set forth in FRAP 32(a)(7)(B) and 11th Circuit Rule 32-4, because, excluding the parts of the brief exempted by FRAP 32(f) and 11th Circuit Rule 32-4, this brief contains 11,362 words, as computed by Microsoft Word.


*/s/ Christine Harding Hart*
CHRISTINE HARDING HART
Attorney for Legacy Cabinets, LLC


## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was filed on March 18, 2022 with the Clerk of the Court via the Court's CM/ECF system, which will send notice to the following counsel of record:

Jon C. Goldbarb
L. William Smith
Wiggins, Childs, Pantazis, Fisher & Goldfarb, LLC
301 19th Street North
Birmingham, AL 35203

*/s/ Christine Harding Hart*